AMENDED AND RESTATED LOAN AGREEMENT

DATED AS OF MARCH 10, 2022

AMONG

McCLENNY MOSELEY & ASSOCIATES, PLLC;

McCLENNY LAW GROUP, INC.;

MOSELEY LAW GROUP, INC.;THE GUARANTORS AND EQUITY PARTNERS FROM
TIME TO TIME PARTY HERETO

AND

EQUAL ACCESS JUSTICE FUND LP

Lender Reference:  Loan Number  105

**Exhibit A**

## TABLE OF CONTENTS

SECTION          HEADING          PAGE

SECTION 1. DEFINITIONS; INTERPRETATION...................................................................1

| Section 1.1. | Definitions............................................................................1 |
| Section 1.2. | Interpretation........................................................................9 |
| Section 1.3. | Accounting Terms..................................................................10 |
| Section 1.4. | References to Documents........................................................10 |

SECTION 2. THE FACILITY...........................................................................................10

| Section 2.1. | The Facility..........................................................................10 |
| Section 2.2. | Calculation of Interest............................................................11 |
| Section 2.3. | Maturity of Loan....................................................................12 |
| Section 2.4. | Payments.............................................................................12 |
| Section 2.5. | Recourse.............................................................................13 |
| Section 2.6. | Default Rate.........................................................................13 |
| Section 2.7. | Evidence of Indebtedness........................................................13 |
| Section 2.8. | Agreements Regarding Loan.....................................................13 |
| Section 2.9. | Joint and Several Obligations....................................................14 |

SECTION 3. FEES.

| Section 3.1. | Fees...................................................................................15 |

SECTION 4. PLACE AND APPLICATION OF PAYMENTS...................................................16

| Section 4.1. | Place and Application of Payments.............................................16 |
| Section 4.2. | Non-Business Days.................................................................17 |
| Section 4.3. | Payments Set Aside................................................................17 |

SECTION 5. REPRESENTATIONS AND WARRANTIES.......................................................18

| Section 5.1. | Organization and Qualification..................................................18 |
| Section 5.2. | Authority and Validity of Obligations..........................................18 |
| Section 5.3. | Use of Proceeds; Business Purpose............................................18 |
| Section 5.4. | Financial Reports and Accounts.................................................19 |
| Section 5.5. | No Material Adverse Change.....................................................19 |
| Section 5.6. | Full Disclosure......................................................................20 |
| Section 5.7. | Governmental Authority and Licensing........................................20 |
| Section 5.8. | Legal Interest; Liens...............................................................20 |
| Section 5.9. | Litigation and Other Controversies.............................................20 |
| Section 5.10. | Taxes.................................................................................20 |
| Section 5.11. | Approvals............................................................................20 |
| Section 5.12. | Compliance with Laws and Ethics..............................................21 |
| Section 5.13. | Good Standing......................................................................21 |
| Section 5.14. | Other Agreements.................................................................21 |

Section 5.15.     Solvency and Fraudulent Conveyance ...................................................21
Section 5.16.     No Default ...........................................................................................22
Section 5.17.     Client Fee Agreements .........................................................................22
Section 5.18.     OFAC ...................................................................................................22
Section 5.19.     Reliance Representation .......................................................................22

SECTION 6. CONDITIONS PRECEDENT .............................................................................22

Section 6.1.      All Loans .............................................................................................22
Section 6.2.      Closing Date Loan ...............................................................................23

SECTION 7. COVENANTS .....................................................................................................24

Section 7.1.      Maintenance of Business; Retention of Rights in Law Firm Proceeds. ....................................................................................................................24
Section 7.2.      Taxes and Assessments ........................................................................25
Section 7.3.      Reports .................................................................................................25
Section 7.4.      Inspection .............................................................................................27
Section 7.5.      Borrowings and Guaranties ..................................................................27
Section 7.6.      Liens ....................................................................................................27
Section 7.7.      Mergers, Consolidations and Sales .......................................................28
Section 7.8.      Loans or Advances to Employees .........................................................28
Section 7.9.      Compliance with Laws .........................................................................28
Section 7.10.     Use of Proceeds ...................................................................................29
Section 7.11.     Maintenance of Malpractice Insurance .................................................29
Section 7.12.     Minimum Collateral Coverage .............................................................29
Section 7.13.     Fee Sharing and Referral Agreements ...................................................29
Section 7.14.     Affiliate Transactions Limitation .........................................................29
Section 7.15.     Rent Increase Limitation ......................................................................29

SECTION 8. EVENTS OF DEFAULT AND REMEDIES ........................................................29

Section 8.1.      Events of Default .................................................................................29
Section 8.2.      Non-Bankruptcy Defaults ....................................................................31
Section 8.3.      Bankruptcy Defaults ............................................................................31

SECTION 9. THE GUARANTEES ..........................................................................................32

Section 9.1.      The Guarantees ....................................................................................32
Section 9.2.      Guarantee Unconditional .....................................................................32
Section 9.3.      Discharge Only upon Payment in Full; Reinstatement in Certain Circumstances .....................................................................................................33
Section 9.4.      Subrogation ..........................................................................................33
Section 9.5.      Subordination ......................................................................................34
Section 9.6.      Waivers ................................................................................................34
Section 9.7.      Stay of Acceleration ............................................................................34
Section 9.8.      Benefit to Guarantors ..........................................................................34
Section 9.9.      Transfers of Guarantor Property ...........................................................34

*Section 9.11.*  Personal Assets Lien. ...........................................................35

SECTION 10. COLLATERAL. ..................................................................35

*Section 10.1.*  Collateral. ...........................................................................35
*Section 10.2.*  Direction of Proceeds; Depository Banks. ........................36
*Section 10.3.*  Additional Lender Protections. ..........................................37
*Section 10.4.*  Further Assurances. ...........................................................37

SECTION 11. MISCELLANEOUS. ............................................................37

*Section 11.1.*   Notices. ..............................................................................37
*Section 11.2.*   Amendments. ......................................................................38
*Section 11.3.*   Costs and Expenses; Indemnification. ...............................38
*Section 11.4.*   No Waiver, Cumulative Remedies. .....................................39
*Section 11.5.*   Survival of Representations. ...............................................40
*Section 11.6.*   Survival of Indemnities. .....................................................40
*Section 11.7.*   Counterparts; Integration; Effectiveness. ...........................40
*Section 11.8.*   Headings. ...........................................................................40
*Section 11.9.*   Severability of Provisions. .................................................40
*Section 11.10.*  Construction. ......................................................................41
*Section 11.11.*  Excess Interest. ...................................................................41
*Section 11.12.*  Independent Evaluation of loan Parties; No Advisory or Fiduciary Responsibility of Lender. ..........................................42
*Section 11.13.*  Binding Nature. ..................................................................42
*Section 11.14.*  Governing Law. ..................................................................43
*SECTION 11.15.*  Waiver of Jury Trial; Binding Arbitration. .......................43
*Section 11.16.*  Future Financing. ...............................................................46
*Section 11.17.*  USA Patriot Act. .................................................................47
*Section 11.18.*  Confidentiality. ..................................................................47

EXHIBIT A       —    Notice of Borrowing
EXHIBIT B       —    Note
EXHIBIT C       —    Additional Guarantor Supplement
EXHIBIT D       —    Direction of Proceeds
EXHIBIT D-1     —    Loan Proceeds Distribution
EXHIBIT E       —    Compliance Certificate
EXHIBIT F       —    Letter of Authorization
EXHIBIT G       —    Monthly Compliance Certificate
EXHIBIT H       —    Closing Collateral Certification

SCHEDULE 10.2   —    Deposit Accounts

# AMENDED AND RESTATED LOAN AGREEMENT

This Amended and Restated Loan Agreement (the "*Agreement*" or "*Loan Agreement*") is entered into as of March 10, 2022, among McClenny Moseley & Associates, PLLC, a Texas professional limited liability company, McClenny Law Group, Inc., a Texas professional corporation, and Moseley Law Group, Inc., a Texas professional corporation (the "*Borrower*"), the Equity Partners party to this Agreement as Guarantors, and Equal Access Justice Fund LP, a Delaware limited partnership (the "*Lender*"), as the lender as provided herein, having an address of Equal Access Justice Fund LP c/o Delaware Trust Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

## PRELIMINARY STATEMENT

The Borrower and Lender are parties to a loan agreement dated as of September 30, 2021 (as the same has been amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "*Original Loan Agreement*"), according to which Lender has made a loan to Borrower.

The Borrower and Guarantor have requested, and the Lender has agreed, to extend the loan and make certain amendment to the credit facility on the terms and conditions of this Agreement.

The Borrower, Guarantor and Lender have agreed to enter into this Loan Agreement as an amended and restated agreement of the Original Loan Agreement.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.   DEFINITIONS; INTERPRETATION.

*Section 1.1.*   Definitions
The following terms when used herein shall have the following meanings:

"*Adverse Case Resolution*" means, with respect to any Case, a Case Resolution that results in no Law Firm Proceeds. However, Adverse Case Resolution does not include: (i) a voluntary dismissal; (ii) entry of judgment or dismissal resulting from a motion to dismiss, summary judgment, or otherwise, wherein the court allows for an amended or refiled pleading to correct an alleged failure to adhere to procedural or substantive prerequisites to maintaining such legal matter; (iii) entry of judgment or dismissal resulting from a motion to dismiss, summary judgment, or otherwise, wherein the court disallows an amended or refiled pleading to cure an alleged failure to adhere to procedural or substantive prerequisites to properly filing or maintaining such legal matter or (iv) dismissal or entry of judgment based upon actions and omissions that establish the basis of a legal malpractice claim or allegation.

Borrower Initials: _____

Lender Reference:  Loan Number 105

"*Affiliate*" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; *provided that*, in any event for purposes of this definition, any Person that owns, directly or indirectly, five percent (5.00%) or more of the securities having the ordinary voting power for the election of directors or governing body of a corporation or five percent (5.00%) or more of the partnership or other ownership interest of any other Person (other than as a limited partner of such other Person) will be deemed to Control such corporation or other Person.

"*Agreement*" means this Loan Agreement, as the same may be amended, modified, restated or supplemented from time to time pursuant to the terms hereof.

"*Borrower*" is defined in the introductory paragraph of this Agreement.

"*Business Day*" means any day (other than a Saturday or Sunday) on which banks are not authorized or required to close in Wilmington, Delaware.

"*Case*" or "*Cases*" mean legal matters in which the Borrower or the Borrower's successor in interest is an attorney of record or co-counsel or from which the Borrower or the Borrower's successor in interest otherwise receives fees in exchange for services rendered or referrals and includes, but is not limited to, all trial court proceedings, appellate proceedings, proceedings on remand, enforcement, ancillary, parallel or alternate dispute resolution proceedings and processes arising out of or related to a legal matter, such as if a matter must be refiled due to a procedural or pleading deficiency, Commercial Tort Claims, and all other proceedings founded on the underlying facts giving rise to a legal matter.

"*Case Resolution*" means, with respect to any Case, either full and final settlement of the Case or the entry of a final, non-appealable and enforceable judgment, in either case, resolving with prejudice all aspects and elements of such Case.

"*Change of Control*" means any Guarantor ceases to be an Equity Partner in the Borrower for any reason, including, without limitation, death, incapacity or termination.

"*Closing Date*" means the date of this Agreement or such later Business Day upon which each condition described in Section 6 shall be satisfied or waived in a manner acceptable to the Lender in its discretion.

"*Code*" means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

"*Collateral*" means all properties, rights, interests, and privileges from time to time subject to the Liens granted to the Lender by the Collateral Documents or which are intended to be subject to the Liens granted to the Lender, *provided* that Collateral shall not include any Excluded

-2-

Property. Collateral includes, but is not limited to, all charging liens or charging lien rights Borrower has.

*"Collateral Documents"* means the Security Agreement, each Control Agreement and all other mortgages, deeds of trust, security agreements, pledge agreements, assignments, financing statements, control agreements, and other documents as shall from time to time secure or relate to the Obligations or any part thereof.

*"Commercial Tort Claims"* are claims arising in tort with respect to which: (A) the claimant is an organization; or (B) the claimant is an individual and the claim: (i) arose in the course of the claimant's business or profession; and (ii) does not include damages arising out of personal injury to or the death of an individual.

*"Compliance Certificate"* means the certificate in the form of Exhibit E, or in such other form acceptable to the Lender, to be delivered to the Lender pursuant to Section 7.3.

*"Control"* means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

*"Control Agreement"* is defined in Section 10.2(a).

*"Custodian"* means Delaware Trust Company, having an address of 251 Little Falls Drive, Wilmington, Delaware 19808, in its capacity as the custodian hereunder, and any successor in such capacity.

*"Debtor Relief Laws"* means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

*"Default"* means any event or condition which constitutes an Event of Default or any event or condition the occurrence of which would, with the passage of time or the giving of notice, or both, constitute an Event of Default.

*"Default Rate"* is defined in Section 2.6.

*"Designated Disbursement Account"* means the Operating Account designated in writing to the Lender as the Borrower's Designated Disbursement Account (or such other account as the Borrower and the Lender may otherwise agree) pursuant to Exhibit D.

Borrower Initials: _____

Lender Reference: Loan Number 105

*"Disciplinary Action"* means (i) any motion or action by or before any Governmental Authority (including, without limitation, any court, arbitrator, arbitration panel in any domestic or foreign jurisdiction), which alleges that the Borrower or any of its Equity Partners or employees committed any professional misconduct (including, without limitation, any violation of the Disciplinary Rules) and for which a penalty is sought (whether such penalty is money damages or restitution, the referral of the Borrower or one of its Equity Partners or employees to any state bar association or other disciplinary authority related to the professional responsibility of attorneys); or (ii) any denial or revocation of any pro hac application or admission in any jurisdiction.

*"Disciplinary Rules"* is defined in Section 5.12.

*"Effective Date"* shall mean the date first set forth above.

*"Equity Partner"* means a Person directly or indirectly owning an equity interest in the Borrower (including, but not limited to, a partner, member, shareholder, sole proprietor or other designation as applicable to the organizational form of the Borrower).

*"Event of Default"* means any event or condition identified as such in Section 8.1.

*"Expense"* or *"Expenses"* means costs and expenses of litigation, including, without limitation. court filing fees. deposition costs. expert fees and expenses. investigation costs. long-distance telephone charges. messenger service fees. photocopying expenses. process server fees. case development costs. and medical expenses. and, in addition. marketing and case acquisition costs; *provided, however,* that "Expenses"shall not include attorney fees of the Loan Parties. salaries or other overhead of the Loan Parties. The Borrower agrees not to pass through any expenses to its client which are not permitted in the written contract between the Borrower and its client.

*"Facility"* means the credit facility for making Loans described in Section 2.1.

*"Fees"* means the Late Advance Fees, Late Fees and Late Reporting Fees, Services Fees provided in Section 3.1 and other fees charged by Lender.

*"GAAP"* means generally accepted accounting principles in the U.S. set out in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and the Financial Accounting Standards Board as in effect from time to time and applied in accordance with Section 1.3 hereof.

*"Governmental Authority"* means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

-4-

Borrower Initials: _____

Lender Reference: Loan Number 105

*"Guarantee"* of or by any Person (the *"guarantor"*) means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the *"primary obligor"*) in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; *provided*, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

*"Guaranty Agreements"* means and includes the Guarantee of the Guarantors provided for in Section 9, and any other guaranty agreement executed and delivered in order to guarantee the Obligations or any part thereof in form and substance acceptable to the Lender.

*"Guarantor"* or *"Guarantors"* means and includes each Person that signs a Guaranty Agreement.

*"Indebtedness"* means for any Person (without duplication) (a) all indebtedness created, assumed or incurred in any manner by such Person representing money borrowed (including by the issuance of debt securities), (b) all indebtedness for the deferred purchase price of property or services (other than trade accounts payable arising in the ordinary course of business), (c) all indebtedness secured by any Lien upon property of such Person, whether or not such Person has assumed or become liable for the payment of such indebtedness, (d) all capitalized lease obligations of such Person, (e) all obligations of such Person on or with respect to letters of credit, bankers' acceptances and other extensions of credit whether or not representing obligations for borrowed money, (f) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interest in such Person or any other Person or any warrant, right or option to acquire such equity interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (g) all other obligations required by GAAP to be classified upon such Person's balance sheet as liabilities and (h) all Guarantees of such Person in respect of any of the foregoing.

*"Interest Rate"* means ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ per annum, compounded on an annual basis, unless pursuant to Section 11.11 the Maximum Rate will apply.

*"IOLTA Account"* is defined in Section 10.2(b).

*"IRS"* means the United States Internal Revenue Service.

-5-

Borrower Initials: ▮▮▮▮
Lender Reference:  Loan Number 105

*"Late Fees"* is defined in Section 3.1(b).

*"Late Reporting Fees"* is defined in Section 3.1(b).

*"Law Firm Proceeds"* means all funds and other property or value received directly or indirectly by or on behalf of the Borrower or an Affiliate (and not the client's share) on account of (i) any and all gross, pre-tax monetary awards, damages, recoveries, judgments or other property or value awarded to or recovered by or on behalf of (or reduced to a debt owed to) the client on account or as a result or by virtue (directly or indirectly) of a Case, whether by negotiation, arbitration, mediation, diplomatic efforts, Lawsuit, settlement or otherwise, and includes all of the Borrower's legal and/or equitable rights, title and interest in and/or to any of the foregoing, whether in the nature of ownership, lien, security interest or otherwise; (ii) any consequential, recessionary, punitive, exemplary or treble damages, pre-judgment interest (including damages comparable to pre-judgment interest), post-judgment interest, penalties, attorneys' and other fees and costs awarded or recovered on account thereof, and reimbursed expenses; (iii) any recoveries against attorneys, accountants, experts, directors, officers or other related parties in connection with any of the foregoing or the pursuit of the Case and amounts received on account of fees and expenses in connection with any of the forgoing, in each case, whether in the form of cash, real estate, negotiable instruments, intellectual or intangible property, choses in action, contract rights, membership rights, subrogation rights, annuities. claims, refunds, and any other rights to payment of cash and/or transfer(s) of things of value or other property (including property substituted therefor). whether delivered or to be delivered in a lump sum or in installments. in relation to any Case or negotiation with any Person in relation to the Case. and only to the extent such value is actually received by the Borrower or such Affiliate: (iv) any and all other gross revenues received by Borrower in connection with its provision of legal services. including but not limited to services rendered in connection with litigation, transactional or consulting services and regardless of whether any such revenues were pursuant to a contingency, hourly, flat-fee, or other payment agreement; *provided, however*, that "Law Firm Proceeds" shall not include (a) the amount of the recovery actually due and payable to the client, and (b) any amounts actually due and payable to a referral or handling Law firm or attorney that is not employed by or on retainer with Borrower, an Affiliate of Borrower or otherwise related (including by marriage) to Borrower, any Guarantor or any employee of Borrower or Guarantor.

*"Laws"* means, collectively, all international, foreign, federal, State and local statutes, treaties, rules (including those governing the professional conduct of attorneys), guidelines, regulations, ordinances, codes, and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority (whether or not such orders, requests, licenses, authorizations, permits or agreements have the force of Law).

-6-

Borrower Initials: _____

Lender Reference: Loan Number 105

*"Lender"* means Equal Access Justice Fund LP, in its capacity as the lender hereunder, and any successor in such capacity.

*"Lender Parties"* is defined in Section 11.3(b).

*"Legal Requirement"* means any treaty, convention, statute, Law, common Law, rule, regulation, ordinance, license, permit, governmental approval, injunction, judgment, order, consent decree or other requirement of any governmental authority, whether federal, state, or local.

*"Lien"* means any lien (statutory or other), mortgage, security interest, financing statement, collateral assignment, pledge, assignment, charge, hypothecation, deposit arrangement, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, and any financing lease having substantially the same economic effect as any of the foregoing), or encumbrance of any kind, and any other right of or arrangement with any creditor (whether based on common Law, constitutional provision, statute or contract) to have its claim satisfied out of any property or assets, or their Proceeds, before the claims of the general creditors of the owner of the property or assets.

*"Litigation"* means any action by or before any Governmental Authority, arbitrator or arbitration panel.

*"Loan"* is defined in Section 2.1.

*"Loan Advance Fees"* is defined in Section 3.1 (a).

*"Loan Availability Period"* means the period in which credit facility will be available, commencing on the Effective Date and ending on Maturity Date.

*"Loan Documents"* means this Agreement, the Note, the Collateral Documents, the Guaranty Agreements, and each other instrument or document to be delivered hereunder or thereunder or otherwise in connection therewith.

*"Loan Extension Fees"* is defined in Section 3.1 (a).

*"Loan Party"* means the Borrower and each of the Guarantors.

*"Material Adverse Effect"* means (a) a material adverse change in, or material adverse effect upon, the operations, business, property, condition (financial or otherwise) or prospects of the Borrower, (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document or (c) a material adverse effect upon (i) the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document or the rights and remedies of the Lender thereunder or (ii) the perfection or priority of any Lien granted under any Collateral Document.

-7-

Borrower Initials: _MAC_

*"Mandatory Payment"* is defined in Section 2.4(b).

*"Maturity Date"* means the earliest of (i) September 30, 2024, or (ii) the date upon which the Loan is accelerated in accordance with Sections 8.2 or 8.3. The Facility may be renewed annually following the Maturity Date on Lender's discretion.

*"Malpractice Insurance Policies"* is defined in Section 7.11.

*"Maximum Rate"* means the maximum non-usurious amount and the maximum non-usurious rate of interest that the Lender is permitted to contract for, charge, take, reserve or receive on the Obligations under 6 Del. C. § 2301(c) and successor statutes. In the unlikely event that a court, arbitrator, or other tribunal were to disregard the Lender and Borrower's choice of Delaware Law and apply the Laws of some other jurisdiction to determine maximum rate, and such determination were to be upheld in a final and non-appealable order, award, or judgment, then the Maximum Rate would mean the maximum non-usurious amount and the maximum non-usurious rate of interest that the Lender is permitted to contract for, charge, take, reserve or receive on the Obligations under the applicable Laws of such other jurisdiction, and any additional interest or charges treated as interest over the Maximum Rate shall be deemed to have been a mistake and automatically cancelled. For the avoidance of doubt, if a change of Laws shall occur and the Maximum Rate under applicable Laws shall change, for purposes of this Agreement and the other Loan Documents, the Maximum Rate shall only be applied retroactively if retroactive application is so required by Law and if not, the Maximum Rate shall only be applicable pursuant to the terms of this Agreement and the Loan Documents as of the effective date of such change.

*"NDA Signing Date"* means September 10, 2021, the date the Borrower signed a non-disclosure agreement with Lender.

*"Note"* is defined in Section 2.7(d).

*"Obligations"* means all obligations of the Borrower to pay principal and interest on the Loan, all fees and charges payable hereunder, and all other payment obligations of the Borrower or any other Loan Parties arising under or in relation to any Loan Document, in each case whether now existing or hereafter arising, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired.

*"Operating Account"* is defined in Section 10.2(a).

*"Person"* means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

*"Responsible Officer"* of any Person means any executive officer of such Person and any other officer, Equity Partner or managing member or similar official thereof with responsibility for the administration of the obligations of such Person in respect of this Agreement.

-8-

Borrower Initials: _____

Lender Reference: Loan Number 105

*"Revenues"* means, with reference to any period, the gross consolidated revenues of the Borrower.

*"Security Agreement"* means that certain Security Agreement dated the date hereof between the Borrower and the Lender, as the same may be amended, modified, supplemented or restated from time to time.

*"Solvent"* means a condition of a Person on a particular date, whereby on such date (a) the fair value of the assets of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature, and (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital, and (e) such Person is generally paying such Person's debts as and when they come due. In computing the amount of contingent liabilities at any time, it is intended that such liabilities will be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

*"UCC"* means the State of Delaware Uniform Commercial Code, as amended from time to time; *provided* that if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Delaware, "UCC" shall mean the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

*"U.S. Dollars"* and *"$"* each means the Lawful currency of the United States of America.

*Section 1.2.* Interpretation.

(a) The meanings of words and defined terms are equally applicable to the singular and plural forms of the defined terms and words. Defined terms in respect of one gender include each other gender where appropriate. Derivatives of defined terms have corresponding meanings.

(b) Any conflict or ambiguity between this Agreement and any other Loan Document is controlled by the terms and provisions of this Agreement.

(c) The headings and captions used in this Agreement and the other Loan Documents are for convenience only and will not be deemed to limit, amplify or modify the terms of this Agreement or the Loan Documents.

Borrower Initials: _____
Lender Reference: Loan Number 105

(d)     Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears, unless otherwise indicated.

(e)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(f)     The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision of such Loan Document.

(g)     The term "including" is by way of example and not limitation.

(h)     Any reference herein to any Person shall be construed to include such Person's successors and assigns.

(i)     The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including, but not limited to, cash, securities, accounts, choses in action, and contract rights.

(j)     All references to time of day herein (e.g., 11:00 a.m.) are to the time recognized in Wilmington, Delaware (daylight or standard, as applicable), unless otherwise specifically provided.

Section 1.3.     Accounting Terms. All accounting terms not specifically or completely defined in this Agreement shall be construed in conformity with, and all financial data required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, with all accounting principles being consistently applied from period to period and on a basis consistent with the most recent financial statements of the Borrower.

Section 1.4.     References to Documents. Unless otherwise expressly provided in this Agreement, (a) references to corporate formation or governance documents, contractual agreements (including this Agreement and the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Loan Document, and (b) references to any Law shall include all statutory and regulatory provisions, or rules, consolidating, amending, replacing, supplementing or interpreting such Law.

SECTION 2.   THE FACILITY.

Section 2.1.     The Facility. The Lender previously made loans (the *"Initial Loans"*) to the Borrower as of September 30, 2021. As of March 10, 2022, the principal amount justly and truly owing on the Initial Loans is $8,000,000.00 in total, without defense, offset or counterclaim.

Borrower Initials: _____

Lender Reference:  Loan Number 105

Subject to the terms and conditions hereof, the Lender agrees to make an additional loan (an *"Additional Loan"*) in U.S. Dollars to the Borrower on March 10, 2022 in an amount equal to $2,000,000.00. The Additional Loan together with the Initial Loans shall be combined into a single loan with the principal amount of such loans (equal to $10,000,000.00) being referred to herein individually as a *"Loan"* and collectively as the *"Loans"*. The Loans shall be advanced in one or more borrowings during the Loan Availability Period, commencing with an initial advance of $2,000,000.00 to be transferred by Lender to Borrower on the Closing Date (the *"Initial Advance"*). Subsequent to the transfer of the Initial Advance, the Borrower may request additional advances of funding in increments of at least $100,000.00, until the maximum value of the facility is reached (the *"Additional Advances"*). The Borrower may only request the Additional Advances on a once-per-month basis. No amount repaid or prepaid on any Loan may be borrowed again (such re-borrowed Loan, a *"Reborrowed Loan"*) other than as consented to by the Lender in writing, such consent not to be unreasonably withheld and on a best efforts basis; *provided* that, notwithstanding the foregoing, (i) no Reborrowed Loan may be borrowed again after the first anniversary of the Closing Date, (ii) the Borrower may not request more than one Reborrowed Loan per month, (iii) any such Reborrowed Loan must be in a minimum amount of $100,000.00, and (iv) the aggregate principal amount of all Reborrowed Loan shall never exceed $10,000,000.00. The proceeds of the Additional Loan will be sent via wire or other electronic funds transfer to the Designated Disbursement Account following the Lender's receipt of the Borrower's written direction and funds transfer information and satisfaction of the conditions precedent in this Agreement. The principal will be decreased by the amount of any prepayments made and increased by the amount of any unpaid interest that accrues on the Loans and is added to the principal balance as set forth in Section 2.2. The Borrower shall give a notice to the Lender requesting the advance of a Loan to the Lender by telephone or other telecommunication device acceptable to the Lender (which notice shall be irrevocable once given and, if by telephone, shall be promptly confirmed in writing in a manner acceptable to the Lender), substantially in the form attached hereto as Exhibit A (Notice of Borrowing), or in such other form acceptable to the Lender. The Borrower agrees that the Lender may rely on any such telephonic or other telecommunication notice given by any person the Lender in good faith believes is a Responsible Officer without the necessity of independent investigation, and in the event any such notice by telephone conflicts with any written confirmation such telephonic notice shall govern if the Lender has acted in reliance thereon.

  *Section 2.2.* Calculation of Interest. Each Loan shall bear interest at a rate per annum equal to the Interest Rate from the Closing Date until the entire unpaid balance of the principal including unpaid accrued interest has been paid in full. Interest shall be computed based on a 360-day year and the actual number of days elapsed. On an annual basis, unpaid accrued interest as of the day prior to the anniversary date of the Loan agreement will compound (be added to the unpaid principal balance) on the anniversary date of the Loan Agreement. Interest will be charged on the new principal balance until it is repaid.

Borrower Initials: _____
Lender Reference: Loan Number 105

*Section 2.3.* Maturity of Loan. The Borrower shall make a payment of all principal and interest not sooner paid on the Loans due and payable on the Maturity Date, subject to the provisions of Section 2.4.

*Section 2.4.* Payments.

(a) *Optional Payments.* The Borrower may prepay in whole or in part (without penalty or premium) upon notice delivered by the Borrower to the Lender no later than 5:00 p.m. on the date of payment (Wilmington, Delaware time).

(b) *Mandatory Payments.* The Borrower unconditionally agrees to prepay to the Lender on the tenth (10th) day after the end of each calendar quarter in each fiscal year, commencing with the calendar quarter ending December 31, 2021, and continuing each calendar quarter thereafter until the Maturity Date, the accrued interest then payable and owing on the Loan. Should Lender, in its sole discretion, agree to modify and extend the term of the Loan beyond the Maturity Date, Borrower shall pay to the Lender on the tenth (10th) day after the end of each calendar month, an amount equal to ███████████████ (the "Mandatory Payment Percentage") of Law Firm Proceeds for any such calendar month subsequent to the original Maturity Date (the "Mandatory Payment"), *provided that*:

(i) if the amount of interest due on the Loan is equal to or greater than ████ ██████ of the current principal balance of the Loan, then the Borrower shall pay an amount equal to ████████████████ of Law Firm Proceeds for such calendar month; or

(ii) if the amount of the Obligations is equal to or greater than ██████████ ████████ of the original principal amount of the Loan, then the Borrower shall pay an amount equal to ██████████████ of Law Firm Proceeds for such calendar month; or

(iii) if the Borrower fails to provide the information required by Section 7.3 or, if the Lender believes, in its good faith judgment, that the information provided by the Borrower is inaccurate, then the Borrower shall pay an amount equal to ████████ ██████████ of Revenues for such calendar month.

(c) The Borrower acknowledges, understands and agrees that any optional payments or other amount repaid in addition to the Mandatory Payments required above (whether intentional or inadvertent, made by the Borrower or a third party on the Borrower's behalf) does not reduce the amount or percentage of any subsequent Mandatory Payment required under the terms of this Agreement. The Borrower agrees that the Lender is not required to credit or apply any optional payment amounts to the next Mandatory Payment amount, and any Mandatory Payments must be made in the full amount as set forth in this Section 2.4, without deduction or offset by the Borrower or otherwise.

-12-

Borrower Initials: *MAC / L*
Lender Reference: Loan Number 105

(d)      All payments shall be applied according to Section 4.1.

*Section 2.5.*      Recourse. The Obligations shall be full recourse to the Loan Parties.

*Section 2.6.*      Default Rate. Notwithstanding anything to the contrary contained herein, while any Event of Default exists or after acceleration, the Borrower shall pay interest (after as well as before entry of judgment thereon to the extent permitted by Law) on the principal amount of the Loans and other amounts at a rate per annum equal to the sum of five percent (5.00%) *plus* the Interest Rate (the *"Default Rate"*); *provided, however,* that in the absence of acceleration pursuant to Sections 8.2 or 8.3, any adjustments pursuant to this Section shall be made at the election of the Lender, with written notice to the Borrower (which election may be retroactively effective to the date of such Event of Default). While any Event of Default exists or after acceleration, interest shall be paid on demand of the Lender. If the Default Rate should ever exceed the Maximum Rate, then the Maximum Rate shall apply instead.

*Section 2.7.*      Evidence of Indebtedness.

(a)      The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower resulting from the Loans made by the Lender from time to time, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.

(b)      The Lender shall also maintain accounts in which it will record (i) the amount of the Loans made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to the Lender hereunder, and (iii) the amount of any sum received by the Lender hereunder from the Borrower.

(c)      The entries in the accounts maintained pursuant to subsections (a) and (b) above shall be *prima facie* evidence of the existence and amounts of the Obligations therein recorded; *provided, however,* that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Obligations in accordance with their terms.

(d)      The Borrower shall prepare, execute and deliver to the Lender a promissory note payable to the Lender or its registered assigns in the forms of Exhibit B (the *"Note"*).

*Section 2.8.*      Agreements Regarding Loan.

(a)      The Borrower and the Lender hereby agree that this Agreement and all the Loan Documents evidence a loan and financing agreement wherein at the Borrower's request the Lender is providing financing to the Borrower, and the Borrower represents to the Lender that the contemplated transactions do not constitute in any manner a fee sharing agreement between the

-13-

Borrower Initials: _____
Lender Reference:  Loan Number 105

Lender and the Borrower with respect to any specific individual Case. It is the intent of both the Borrower and Lender to strictly comply with all Laws and all relevant ethical obligations.

(b)     The Borrower and the Lender hereby agree that the Lender will not exercise influence or control over the strategy with respect to any Case, which is within the purview of the attorney of record and his or her client, and Lender shall not have direct contact with the Borrower's clients prior to an Event of Default. As such, the Borrower shall not, without the consent of the relevant client, disclose to the Lender any attorney-client privileged or confidential information of its clients relating to the Cases or otherwise. The Lender shall not interfere, and the Borrower shall not allow any interference by the Lender, with the attorney-client relationship, Borrower's handling of its clients' cases, Borrower's decisions regarding its clients' cases, or maintaining client confidences in connection with any Cases or otherwise, the Lender's interest being solely the collection of the Obligations.

(c)     The Borrower and the Lender hereby agree that the Lender, in its sole discretion in each instance, may extend the Maturity Date by successive twelve-month periods (each twelve-month period an "*Extension Period*"). The Lender will provide Borrower with notice (the "*Application Notice*") of the Borrower's opportunity to apply for such an extension ninety (90) days prior to (i) the Maturity Date or (ii) the end of the currently applicable Extension Period. The Borrower must submit its application for extension to the Lender, in the form specified by the Lender in the Application Notice, no later than sixty (60) days prior to (i) the Maturity Date or (ii) the end of the currently applicable Extension Period. The lender will evaluate the Borrower's application and determine, in Lender's sole discretion, whether to grant an extension of the Maturity Date or, if applicable, a successive Extension Period. Borrower must pay an extension fee as provided in Section 3.1(c) below for each such extension, if any.

*Section 2.9.*     Joint and Several Obligations. Each party constituting the Borrower hereby unconditionally and irrevocably agrees it is jointly and severally liable to the Lender for the payment and performance of the Obligations. Each party constituting the Borrower acknowledges and agrees that its joint and several liability on the Obligations owed by any party or parties constituting the Borrower under this Agreement is absolute and unconditional and shall not in any manner be affected or impaired by any acts or omissions whatsoever by the Lender, and without limiting the generality of the foregoing, each party constituting the Borrower's joint and several liability on the Obligations shall not be impaired by any acceptance by the Lender of any other security for or Guarantors upon the Obligations or by any failure, neglect or omission on the Lender's part to resort to any one or all of the parties constituting the Borrower for payment of the Obligations or to realize upon or protect any collateral security therefor. Each party constituting the Borrower's joint and several liability on the Obligations shall not in any manner be impaired or affected by who receives or uses the proceeds of the Loans or for what purposes such credits and financial accommodations are used, and each party constituting the Borrower waives notice of borrowing requests issued by, and Loans made to, the other parties constituting the Borrower. Such joint and several liability of each party constituting the Borrower shall also not be impaired or affected by (and the Lender, without notice to anyone, is hereby authorized to make from time

-14-

Borrower Initials: _____
Lender Reference: Loan Number 105

to time) any sale, pledge, surrender, compromise, settlement, release, renewal, extension, indulgence, alteration, substitution, exchange, change in, modification or disposition of any collateral security for the Obligations or of any guaranty thereof. In order to enforce payment of the Obligations, foreclose or otherwise realize on any Collateral, or exercise any other rights granted hereunder or under any other Loan Document or under applicable Law (all in accordance with the terms of the Loan Documents), the Lender shall be under no obligation at any time to first resort to any Collateral, property, Liens, or any other rights or remedies whatsoever, and the Lender shall have the right to enforce the Obligations irrespective of whether or not other proceedings or steps are pending seeking resort to or realization upon or from any of the foregoing. Each party constituting the Borrower hereby agrees not to exercise or enforce any right of exoneration, contribution, reimbursement, recourse, or subrogation available to such party against any other party constituting the Borrower liable for payment of any Obligations, or as to any security therefor, unless and until the Obligations have been paid in full. By its acceptance below, each party constituting the Borrower hereby expressly waives and surrenders any defense to its joint and several liability on the Obligations based upon any of the foregoing. In furtherance thereof, each party constituting the Borrower agrees that wherever in this Agreement it is provided that the Borrower is liable for a payment or performance of an obligation, such obligation is the joint and several obligation of each party constituting the Borrower. Notwithstanding anything herein to the contrary, the right of recovery against each party constituting the Borrower under this Agreement shall not exceed $1.00 less than the lowest amount which would render such amount constituting the Borrower's obligation under this Agreement void or voidable under applicable Law, including, without limitation, fraudulent conveyance Law.

SECTION 3.   FEES.

     *Section 3.1.*   Fees.

     (a)   *Loan Advance Fees and Loan Extension Fees.* The Borrower shall pay to the Lender, on the date of each advance of a Loan, a non-refundable advance fee in an amount equal to ▮▮▮▮▮▮▮▮ of the principal amount of the Loan advanced on such date (including, for the sake of clarity, any Loan advanced as a reborrowing after a principal payment) (the "*Loan Advance Fees*"). The Borrower shall pay to the Lender, on the date of each extension of a Loan, a non-refundable extension fee in an amount equal to ▮▮▮▮▮▮▮▮ of the outstanding principal amount of the Loan extended on such date (the "*Loan Extension Fees*"). The Lender is hereby authorized to deduct such amounts from the disbursement of such Loan. Borrower acknowledges and agrees that this fee approximates the overhead and direct costs of Lender associated with loan setup, documentation, and initial administrative work and merely compensates Lender for those expenses.

     (b)   *Late Fees and Late Reporting Fees.* In addition to any other amounts due hereunder, if any payment due hereunder is not received by the Lender on or before 1:00 p.m. (Wilmington, Delaware time) of the fifth (5th) Business Day after such payment is due, the Borrower shall pay to the Lender on demand a late fee of (i) ▮▮▮▮▮ per occurrence for the first

-15-

three occurrences, (ii) ▮▮▮▮ per occurrence for the fourth, fifth and sixth occurrences, and (iii) ▮▮▮▮ per occurrence for the seventh occurrences and any occurrence thereafter (the "*Late Fees*"). Borrower acknowledges and agrees that this late fee approximates the overhead and direct costs of Lender associated with Borrower being late on any payment and merely compensates Lender for those expenses. Additionally, if any document or information required to be provided to Lender under this Loan Agreement is not delivered when due or within ten (10) business days following request from Lender, Borrower shall pay a Late Reporting Fee of (i) ▮▮▮▮ upon Borrower's failure to timely provide any such document or information; (ii) ▮▮▮▮ for every additional month in which Borrower fails to timely provide any such document or information up to six additional months; and (iii) ▮▮▮▮ for every additional month after six months from the date that Borrower failed to timely provide any such document or information (the "*Late Reporting Fees*"). The Lender may draw the Late Fees and Late Reporting Fees from the Borrower's Operating Account through an ACH transaction, pursuant to the terms of the ACH Authorization form.

(c)     *Servicing Fees.* The Borrower shall pay to the Lender, on the date of each advance of a Loan, a non-refundable servicing fee in an amount equal to ▮▮▮▮ of the principal amount of the Loan advanced on such date (including, for the sake of clarity, any Loan advanced as a reborrowing after a principal payment). The Lender is hereby authorized to deduct such amount from the disbursement of such Loan. In addition, the Borrower shall pay to the Lender, on the date that is the fifth (5th) Business Day after each anniversary of the Original Loan Agreement, a non-refundable servicing fee in an amount equal to ▮▮▮▮ of the aggregate outstanding principal balance (including interest compounded on the anniversary date pursuant to Section 2.2) of the Loans as of such anniversary. Borrower acknowledges and agrees that the servicing fees approximate the overhead and direct costs of servicing by Lender and merely compensates Lender for those expenses. The Lender may draw the annual Servicing Fee from the Borrower's Operating Account through an ACH transaction, pursuant to the terms of the ACH Authorization form.

(d)     *Borrower's Acknowledgement that the Fees are Reasonable.* The Borrower represents and warrants that the Fees are standard in the industry of lending to Law firms for the type of services provided in respect of the Cases and that in no manner does it constitute an "unconscionable fee" as used in Rule 1.5 of the Disciplinary Rules or pursuant to relevant Law, and that a competent Lawyer would form a reasonable belief that the Fees are reasonable, especially in light of the Borrower's request for funding for its litigation practice and its agreement and understanding of the terms and conditions of this Agreement and other Loan Documents, the complicated nature of the borrowing arrangements, and the potential risks associated with the related transactions.

SECTION 4.   PLACE AND APPLICATION OF PAYMENTS.

*Section 4.1.*     Place and Application of Payments.   All payments of principal of and interest on the Loans, and all other Obligations payable by the Borrower under this Agreement and

-16-

Borrower Initials: ▮▮▮▮
Lender Reference:  Loan Number 105

the other Loan Documents, shall be made by the Borrower to the Lender prior to 5:00 p.m. (Wilmington, Delaware time) on the due date thereof at the place designated for payment by the Lender in Wilmington, Delaware. Any payments received after such time shall be deemed to have been received by the Lender on the next Business Day. All such payments shall be made in U.S. Dollars, either by wire or automated clearinghouse (ACH) transfer, at the place of payment as set forth below:

> ABA Routing Number:
> Bank Name:
> Address:
> Account Number:
> Account Name:

If payments are not received by the applicable due date and past the applicable grace period, the Lender may draw the Mandatory Payments (as calculated in the Lender's reasonable judgment and on a best-efforts basis) from the Borrower's Operating Account pursuant to the terms in the ACH Authorization. If the Lender must initiate monthly payment transactions, it may in its sole discretion, also determine whether a Late Fee is required, pursuant to Section 3.1(b) and include such amount in the transaction.

All such payments are to be applied by Lender, a Delaware limited partnership, in Delaware to the Obligations of Borrower determined by Lender in its discretion, in each case without set-off or counterclaim. The Borrower agrees that payments shall not be made by check or cash and that the Lender has no obligation to accept such payments. All payments shall first be applied to indemnities, expenses and fees (including but not limited to those fees due under Section 3 of this Agreement) payable to the Lender or any other indemnified Person under this Agreement or the Loan Documents, then to all outstanding fees and charges, then to all accrued but unpaid interest on the Loans, and then to the outstanding principal balance of the Loans.

> *Section 4.2.* Non-Business Days. If any payment hereunder becomes due and payable on a day which is not a Business Day, the due date of such payment shall be extended to the next succeeding Business Day on which date such payment shall be due and payable. In the case of any payment of principal falling due on a day which is not a Business Day, interest on such principal amount shall continue to accrue during such extension at the rate per annum then in effect, which accrued amount shall be due and payable on the next scheduled date for the payment of interest.

> *Section 4.3.* Payments Set Aside. To the extent that any payment by or on behalf of the Borrower or any other Loan Party is made to the Lender and is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender in its discretion) to be repaid to a trustee, receiver, creditor or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent

-17-

Borrower Initials: _MAC/__
Lender Reference: Loan Number 105

of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made.

## SECTION 5.  REPRESENTATIONS AND WARRANTIES.

*Section 5.1.*    Organization and Qualification.  The Borrower is duly organized, validly existing, and in good standing as a limited liability company, limited partnership, corporation, or other appropriate entity, as applicable, under the Laws of the jurisdiction in which it is organized, has full and adequate power to conduct its business as now conducted, and is duly licensed or qualified in all states in which it provides legal services. No Loan Party is the subject of any order of relief under any Debtor Relief Law.

*Section 5.2.*    Authority and Validity of Obligations.  Each Loan Party has full right and authority to enter into this Agreement and the other Loan Documents executed by it, to make the borrowings herein provided for (in the case of the Borrower), to guarantee the Obligations (in the case of each Guarantor), to grant to the Lender the Liens described in the Collateral Documents executed by the Borrower, and to perform all of its obligations hereunder and under the other Loan Documents executed by it. The Loan Documents delivered by the Loan Parties have been duly authorized, executed, and delivered by such Persons and constitute valid and binding obligations of such Loan Parties enforceable against each of them in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar Laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at Law); and this Agreement and the other Loan Documents do not, nor does the performance or observance by any Loan Party of any of the matters and things herein or therein provided for, (a) contravene or constitute a default under any provision of Law or any judgment, injunction, order or decree binding upon any Loan Party or any provision of the organizational documents (*e.g.,* charter, certificate or articles of association and operating agreement, partnership agreement, or other similar organizational documents) of any Loan Party, (b) contravene or constitute a default under any covenant, indenture or agreement of or affecting any Loan Party or any of their respective property or (c) result in the creation or imposition of any Lien on any property of any Loan Party other than the Liens granted in favor of the Lender pursuant to the Collateral Documents.

*Section 5.3.*    Use of Proceeds; Business Purpose.

(a)    The Borrower shall use the proceeds of the Loans only for the commercial purpose of funding Borrower's law firm expenses, repaying any portion of the Facility, and repaying any existing indebtedness the repayment of the Borrower or any Guarantor, and not for any other purpose (including for personal, household or family purposes).

(b)    Borrower shall not use any Loan proceeds (i) to fund any commercial or business activities (including litigation funding of third parties) other than Borrower's Law firm expenses, (ii) to pay bonuses or other incentive payments to Borrower's attorneys or make distributions to

-18-

Borrower Initials: _____

Lender Reference: LoanNumber 105

Borrower's equity owners, or (iii) to pay any amount to brokers and/or consultants used by any Loan Party to obtain the litigation financing contemplated by this Loan Agreement (other than amounts disclosed to Lender and paid directly by Lender on Borrower's behalf). Despite anything to the contrary in this Loan Agreement, nothing in this Loan Agreement is intended (and must not be construed) to limit Borrower's ability to advise its clients or prospective clients with respect to non-Lender independent financing for the client's or prospective client's businesses, pending litigation, or contemplated litigation.

(c)     All Loan proceeds received by Borrower are subject to an express trust in favor of Lender.  Borrower and each Guarantor hold all Loan proceeds as a fiduciary for the benefit of Lender and any use of any Loan proceeds that is not authorized by Lender is a defalcation by Borrower and any such Guarantor so acting on Borrower's behalf.

(d)     Law Firm Proceeds received by Borrower are subject to an express trust in favor of Lender in the amount of Mandatory Payments due or becoming due to Lender.  Borrower and each Guarantor hold such Law Firm Proceeds as a fiduciary for the benefit of Lender and any use of any Law Firm Proceeds that is not permitted under this Agreement or authorized by Lender is a defalcation by Borrower and any Guarantor or other Loan Party utilizing those trust funds. Likewise, Borrower acknowledges that the information provided to Lender by Borrower and Borrower's representations are to obtain money, or an extension, renewal, or refinancing of credit, that Lender is relying upon all of the information and representations, that Lender's reliance is reasonable, and that falsity, fraud, or misapplication of proceeds by Borrower will render Borrower's Obligations to Lender non-dischargeable in bankruptcy under 11 U.S.C. §523(a)(2) and (4).

*Section 5.4.*     Financial Reports and Accounts.  All financial statements of the Loan Parties heretofore submitted to the Lender are true and correct in all material respects, have been prepared in accordance with GAAP, on a basis consistent with the most recent accounting periods, certified as true and correct by a Responsible Officer of the Borrower, and truly and accurately reflect in all material respects the financial condition of the relevant Loan Party and, with respect to the Borrower, the results of the operations and cash flows for the Borrower as of the dates thereof and for the periods covered thereby. The Borrower has no contingent liabilities which are material to it other than as indicated on such financial statements or, with respect to future periods, on the financial statements furnished pursuant to Section 7.3.  The bank accounts set forth on Schedule 10.2 are all the Borrower's accounts and Borrower has no direct or indirect interest in any other accounts.

*Section 5.5.*     No Material Adverse Change.  Since the NDA Signing Date, (a) there has been no change in the condition (financial or otherwise) or business prospects of any Loan Party which individually or in the aggregate could reasonably be expected to have a Material Adverse Effect nor (b) has there been a material adverse change in the value of the Collateral or the Borrower's interest in the same taken as a whole. Since the NDA Signing Date, no Equity Partner has terminated its ownership in the Borrower for any reason. No Equity Partner who previously

-19-

Borrower Initials: MAC / M
Lender Reference:  Loan Number 105

had an ownership interest in the Borrower has given notice that such Equity Partner intends to transfer or has transferred a Case to a firm that is not the Borrower nor, to the knowledge of the Borrower, is any such transfer of a Case threatened.

Section 5.6.  Full Disclosure. The statements and information furnished to the Lender in connection with the negotiation of this Agreement and the other Loan Documents as required to obtain the commitment by the Lender to provide all or part of the financing contemplated hereby or subsequently provided to the Lender as required under the terms of this Agreement (including, but not limited to, the information provided by the Borrower with respect to the Cases from time to time as required by Section 7.3) do not contain any untrue statements of a material fact or omit a material fact necessary to make the material statements contained herein or therein not misleading, the Lender acknowledging that as to any projections furnished to the Lender, the Loan Parties only represent that the same were prepared on the basis of information and estimates the Loan Parties believed to be reasonable.

Section 5.7.  Governmental Authority and Licensing. The Borrower has received all licenses, permits, and approvals of all Governmental Authorities, if any, necessary to conduct its businesses. No investigation or proceeding which, if adversely determined, could reasonably be expected to result in revocation or denial of any material license, permit or approval is pending or, to the knowledge of the Borrower, threatened.

Section 5.8.  Legal Interest; Liens. The Borrower has good and defensible legal interest to its assets as reflected on the most recent consolidated balance sheet of the Borrower furnished to the Lender. The Borrower's assets are subject to no Liens other than such thereof as are permitted by Section 7.6.

Section 5.9.  Litigation and Other Controversies. There is no Litigation or Disciplinary Action or other governmental or arbitration proceeding pending, nor to the knowledge of any Loan Party threatened, against any Loan Party. The Borrower shall notify the Lender in writing upon learning of any pending or threatened Litigation or Disciplinary Action or proceeding that could reasonably be expected, in the aggregate, to have a Material Adverse Effect; provided that the Borrower shall not disclose to the Lender any such information that would violate any duties to any of the Borrower's clients.

Section 5.10.  Taxes. All federal and state tax returns required to be filed by any Loan Party in any jurisdiction have, in fact, been filed, and all taxes upon any Loan Party or upon any of their respective property, income or franchises, which are shown to be due and payable in such returns, have been paid, except such taxes, if any, as are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and as to which adequate reserves established in accordance with GAAP have been provided.

Section 5.11.  Approvals. No authorization, consent, license or exemption from, or filing or registration with, any court or governmental department, agency or instrumentality, nor any

-20-

Borrower Initials: _Mde_

Lender Reference:  Loan Number 105

approval or consent of any other Person, is or will be necessary to the valid execution, delivery or performance by any Loan Party of any Loan Document, except for (i) such approvals which have been obtained prior to the Closing Date and remain in full force and effect and (ii) filings which are necessary to perfect the security interests under the Collateral Documents.

*Section 5.12.*  Compliance with Laws and Ethics. The Borrower represents and warrants that it is in compliance with all Legal Requirements applicable to or pertaining to its business operations, including all federal, state and local attorney ethics rules and regulations relating to attorney financing. The Borrower shall notify the Lender immediately upon its receipt of any written or oral communication from a third party challenging the legality or validity of any Loan Document.

(a)      The Borrower specifically acknowledges, represents and warrants that the provisions of this Agreement, and all of the Loan Documents, comply with all applicable Disciplinary Rules, including, without limitation, the American Bar Association Model Rules of Professional Conduct ("*ABA Model Rules*"), any and all other applicable rules of professional responsibility governing attorney conduct in each of the States and federal districts or circuits where Borrower is licensed or practices and any other analogous rules of ethics or disciplinary rules of any other applicable jurisdiction (the "*Disciplinary Rules*").

(b)      The Borrower waives any right to bring any private cause of action or any suit of any nature against the Lender in connection with any alleged violation of any Disciplinary Rules and hereby acknowledges that the ABA Model Rules specifically state that "[*violation of a Rule should not give rise to a cause of action* (emphasis added) nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to Lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability."

(c)      The Borrower acknowledges that it has entered into this Agreement and all Loan Documents with the Lender as applicable, and that to seek to avoid the provisions hereof or of the Loan Documents based on any violation of any Disciplinary Rule(s) would be, in itself, an abuse of the applicable Disciplinary Rules.

*Section 5.13.*  Good Standing. The Borrower specifically acknowledges, represents and warrants that it is in good standing with the Secretary of State for the State of Texas.

*Section 5.14.*  Other Agreements. No Loan Party is in default under the terms of any covenant, indenture or agreement of or affecting such Person or any of its property, which default if uncured could reasonably be expected to have a Material Adverse Effect.

*Section 5.15.*  Solvency and Fraudulent Conveyance. The Borrower is Solvent, is able to pay its debts as they become due, has sufficient capital to carry on its business and will be Solvent after giving effect to the transactions contemplated by this Agreement. The Borrower is not

-21-

transferring any Collateral with any intent to hinder, delay or defraud any of its creditors or equity holders. The Borrower will not use the proceeds from the transactions contemplated by this Agreement to give preference to any class of creditors.

*Section 5.16.* No Default. No Default has occurred or is continuing.

*Section 5.17.* Client Fee Agreements. Borrower acknowledges the existence of the Lender's lien for each of Borrower's Cases. Borrower acknowledges that the amounts to be paid under its client fee agreements are accounts, general intangibles, or other forms of collateral under Article 9 of UCC. Borrower acknowledges the unmatured client fee agreements are also an account under Article 9 of the UCC. Borrower also acknowledges that its client fee agreements are subject to Article 9. Borrower will take the steps necessary to ensure that the amounts to be paid under its client fee agreements are utilized to pay Lender in accordance with Section 2.4 and are not transferred or diverted for other purposes.

*Section 5.18.* OFAC. The Borrower (i) is not a person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) does not engage in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such person in any manner that violates Section 2 of such executive order, and (iii) is not a person on the list of "Specially Designated Nationals and Blocked Persons" or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.

*Section 5.19.* Reliance Representation. Borrower is making all of the foregoing representations in order to obtain money, or an extension, renewal, or refinancing of credit, Lender is relying upon all of the representations and information provided by Borrower, Lender's reliance is reasonable, and falsity, fraud, or misapplication of proceeds by Borrower will render Borrower's Obligations to Lender non-dischargeable in bankruptcy under 11 U.S.C. § 523(a)(2) and (4).

SECTION 6. CONDITIONS PRECEDENT.

*Section 6.1.* All Loans. At the time of the making of each Loan hereunder:

(a)     each of the representations and warranties set forth herein and in the other Loan Documents shall be true and correct as of said time, except to the extent the same expressly relate to an earlier date, in which case they shall be true and correct as of such earlier date;

(b)     no Default shall have occurred and be continuing or would occur as a result of such Loan; and

-22-

(c) such Loan shall not violate any order, judgment or decree of any court or other authority or any provision of Law or regulation applicable to the Lender as then in effect.

Each request for a Loan hereunder shall be deemed to be a representation and warranty by the Borrower on the date of such Loan as to the facts specified in subsections (a) through (c), both inclusive, of this section; *provided, however,* that the Lender may continue to make advances under the Facility, in the sole discretion of the Lender, notwithstanding the failure of the Borrower to satisfy one or more of the conditions set forth above and any such advances so made shall not be deemed a waiver of any Default or other condition set forth above that may then exist. NOTWITHSTANDING THE FOREGOING, THE LENDER MAY REFUSE TO EXTEND LOANS AT ANY TIME IT DEEMS FIT.

*Section 6.2.* Closing Date Loan. Prior to making the renewal and extension of the Loan and prior to making the Additional Loan on the Closing Date the following conditions precedent shall have been satisfied:

(a) the Lender shall have received this Agreement duly executed by the Borrower and the Guarantors;

(b) the Lender shall have received the duly executed Note of the Borrower dated the date hereof and otherwise in compliance with the provisions of Section 2.7:

(c) Lender shall have received the Security Agreement duly executed by the Borrower, together with a UCC financing statement to be filed against the Borrower, as debtor, in favor of the Lender, as secured party, which financing statement shall include among the listed Collateral all Commercial Tort Claims that the Borrower is handling with the style of the cases, names of the parties, cause numbers, and location and court in which pending;

(d) the Lender shall have received copies of the Borrower's (i) certificate of partnership and partnership agreement (or comparable organizational documents) and any amendments thereto, (ii) resolutions authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby, and (iii) specimen signatures of the persons authorized to execute such Loan Documents, all certified in each instance by its Responsible Officer and notarized;

(e) the Lender shall have received the initial fees called for by Section 3.1;

(f) the capital and organizational structure of the Borrower shall be satisfactory to the Lender;

-23-

Borrower Initials: _____
Lender Reference:  Loan Number 105

(g)     the Lender shall have received financing statement, tax, and judgment lien search results against the Collateral evidencing the absence of Liens thereon except as permitted by Section 7.6;

(h)     the Lender shall have received pay-off and lien release letters from secured creditors of the Borrower (other than secured parties intended to remain outstanding after the Closing Date with Indebtedness and Liens permitted by Sections 7.5 and 7.6) setting forth, among other things, the total amount of indebtedness outstanding and owing to them and containing an undertaking to cause to be delivered to the Lender UCC termination statements and any other lien release instruments necessary to release their Liens on the assets of the Borrower, which pay-off and lien release letters shall be in form and substance acceptable to the Lender;

(i)     the Lender shall have received a fully executed Internal Revenue Service Form W-9 (or its equivalent) for the Borrower and each Guarantor;

(j)     the Lender shall have received a current updated personal financial statement for each Guarantor to be delivered on or before April 15th of each year in the form completed by such Guarantor and delivered to Lender on or before the execution of this Loan Agreement;

(k)     the Borrower and each Guarantor shall have covenanted to produce to Lender an operative Certificate of Good Standing, executed by the Secretary of State for the State of Texas;

(l)     the Lender shall have received from the Borrower a Closing Collateral Certification in the form of Exhibit H;

(m)     the Lender shall have received such other agreements, instruments, documents, certificates, and opinions as the Lender may reasonably request; and

(n)     Lender shall have received payment of all outstanding Loan Extension Fees and servicing fees.

SECTION 7.  COVENANTS.

The Borrower agrees to the following, so long as any credit is available to or in use by the Borrower hereunder, except to the extent compliance in any case or cases is waived in writing by the Lender:

*Section 7.1.*     Maintenance of Business; Retention of Rights in Law Firm Proceeds. The Borrower shall preserve and maintain its existence. Borrower and each Guarantor shall not own or hereafter acquire, without the prior written consent of Lender, an ownership, profit or revenue interest, either direct or indirect, in any entity engaged in the practice of law other than Borrower. The Borrower shall preserve and keep in force and effect all licenses, permits, and approvals necessary to the proper conduct of its business. Neither the Borrower nor any Guarantor shall

-24-

Borrower Initials: _____
Lender Reference:  Loan Number 105

assign or reassign any of such Borrower's or Guarantor's rights to the Law Firm Proceeds in any of the Cases unless and until the Obligations have been paid in full. The Borrower shall handle the Cases with best efforts in order to receive compensation for each of the Borrower's clients, all within the applicable rules of professional responsibility, until the Borrower has satisfied its Obligations under this Agreement.

*Section 7.2.* Taxes and Assessments. The Borrower shall (a) duly pay and discharge all federal, state, and local taxes, rates, assessments, fees, and governmental charges upon or against it, in each case before the same become delinquent and before penalties accrue thereon, unless and to the extent that the same are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves are provided therefor; and (b) shall use the proceeds of the Loans to immediately payoff any and all back taxes owed to the IRS or any other taxing authority immediately subsequent to the Closing Date, and shall furnish proof of payment and final resolution of all back taxes to Lender no later than fifteen (15) days subsequent to the Closing Date.

*Section 7.3.* Reports. The Borrower shall furnish to the Lender:

(a)    as soon as available, and in any event no later than five (5) days after the filing thereof with the IRS, a copy of the federal tax returns of the Borrower;

(b)    as soon as available, and in any event no later than five (5) days after the filing thereof with the IRS, a copy of the federal tax returns of each Guarantor;

(c)    as soon as available, and in any event no later than ten (10) days after the last day of each fiscal month of each fiscal year of the Borrower, a completed monthly repayment report on Lender's form (through Lender's online reporting portal) detailing Law Firm Proceeds received for the month, a copy of all pages of the bank account statements (unredacted and unaltered in any way) for each Operating Account, IOLTA Account, all other deposit accounts, and all the bank accounts to which the Borrower has directed any revenues, if requested, other documentation (for example, cleared check copies or a general ledger report) that would allow Lender to verify the amounts documented or that should have been documented in the repayment report, and a Monthly Compliance Certificate (Exhibit G) certifying that all Law Firm Proceeds have been reported in compliance with this Loan Agreement;

(d)    as soon as available, and in any event no later than fifteen (15) days after the last day of each quarter of each fiscal year of the Borrower, a Compliance Certificate (Exhibit E) signed by a Responsible Officer of the Borrower which certifies (i) that to the best of such officer's knowledge and belief no Default has occurred during the period (including, for the sake of clarity, a Default arising from a breach of Section 7.4 or 7.6) or, if any such Default has occurred during such period, setting forth a description of such Default and specifying the action, if any, taken by the Borrower to remedy the same, (ii) that attached thereto is a true, correct and complete status report of all Cases pending or closed during the applicable reporting period (which status report

-25-

shall include, at a minimum, (a) each case being handled by Borrower, (b) type of case, (c) current case status, (d) fee amounts received by Borrower to date, (e) high and low estimated fee amounts expected to be received, and (f) estimated timeframe to receipt of payments);

(e)   promptly after receipt thereof, a copy of each audit made by any regulatory agency of the books and records of any Loan Party or of notice of any material noncompliance with any applicable Law, regulation or guideline relating to any Loan Party;

(f)   notice of any Change of Control;

(g)   promptly after knowledge thereof shall have come to the attention of any Responsible Officer of the Borrower or any Loan Party, written notice of (i) any threatened or pending Litigation, Disciplinary Action, or any other governmental or arbitration proceeding or labor controversy against any Loan Party or any of their property which, if adversely determined, could reasonably be expected to have a Material Adverse Effect, (ii) the occurrence of any Material Adverse Effect, (iii) the occurrence of any Default, or (iv) any material deterioration in the value of the Collateral or the Borrower's interest therein;

(h)   notice of the Borrower's representation being terminated by any client or of a dual representation claim being asserted as to any client within seven (7) days of such termination or assertion;

(i)   notice of any Equity Partner terminating its ownership in the Borrower for any reason;

(j)   notice within ten (10) days of each new Case involving Commercial Tort Claims, and as soon as available, and in any event no later than thirty (30) days after the last day of each fiscal quarter of each fiscal year of the Borrower, a complete list of all Cases being handled by Borrower, including style of the cases, names of the parties, cause numbers, locations and the courts in which pending, and notification of which Cases contain Commercial Tort Claims.

(k)   copies of Borrower's and Guarantors' applications for malpractice insurance;

(l)   promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Loan Party, or compliance with the terms of any Loan Document, as the Lender may reasonably request, subject to the terms of Section 2.8;

(m)   as soon as available, and in any event no later than thirty (30) days after the last day of each fiscal quarter of each fiscal year of the Borrower, a copy of the financial statements of the Borrower, including but not limited to copies of the Borrower's balance sheet, income statement, and cash flow statement. The Borrower's financial statements shall be true and correct in all material respects, prepared in accordance with GAAP consistently applied, and truly and accurately reflect in all material respects the financial condition of the Borrower; and

-26-

(n)      as stated in Section 3.1(b), if any document or information required to be provided to Lender under this Loan Agreement is not delivered when due or within ten (10) business days following request from Lender, Borrower shall pay a late charge of (i) ■■■■ upon Borrower's failure to timely provide any such document or information; (ii) ■■■■ for every additional month in which Borrower fails to timely provide any such document or information up to six additional months; and (iii) ■■■■ for every additional month after six months from the date that Borrower failed to timely provide any such document or information.

Section 7.4.    Inspection. The Borrower shall permit the Lender and each of its duly authorized representatives and agents to request electronically or to visit and inspect any of its property, corporate books, and financial records (including documentation necessary to support the character and quality of the Collateral), to examine and make copies of its books of accounts and other financial records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers, employees and independent public accountants (and by this provision the Borrower hereby authorizes such accountants to discuss with the Lender the finances and affairs of the Borrower) at such reasonable times and intervals as the Lender may designate and, so long as no Default exists, with reasonable prior notice to the Borrower, subject at all times to all Legal Requirements and Section 2.8.

Section 7.5.    Borrowings and Guaranties. The Borrower shall not issue, incur, assume, create or have outstanding any Indebtedness, or be or become liable as endorser, guarantor, surety or otherwise for any Indebtedness or undertaking of any Person, or otherwise agree to provide funds for payment of the obligations of another, or supply funds thereto or invest therein or otherwise assure a creditor of another against loss, or apply for or become liable to the issuer of a letter of credit which supports an obligation of another, or subordinate any claim or demand it may have to the claim or demand of any Person; provided, however, that the foregoing shall not restrict nor operate to prevent:

(a)      the Obligations of the Borrower owing to the Lender and any other indebtedness, liabilities and obligations of the Borrower owing to the Lender;

(b)      Letter(s) of Protection executed by the Borrower on behalf of its clients provided that Borrower makes a good faith effort to negotiate and lower the amount owed to the Provider under the Letter(s) of Protection;

(c)      purchase money indebtedness and capitalized lease obligations of the Borrower in an amount not to exceed $50,000 in the aggregate at any one time outstanding; and

(d)      unsecured indebtedness of the Borrower not otherwise permitted by this section in an amount not to exceed $50,000 in the aggregate at any one time outstanding.

Section 7.6.    Liens. The Borrower shall pay off the existing indebtedness the Borrower agreed to pay, and have any liens securing such indebtedness released in writing within thirty (30)

-27-

days after the Closing. The Borrower shall not create, incur or permit to exist any Lien of any kind on any of its property (including the Collateral); provided, however, that the foregoing shall not apply to nor operate to prevent:

(a)      Liens arising by statute in connection with worker's compensation, unemployment insurance, old age benefits, social security obligations, taxes, assessments, statutory obligations, the MSPA or other similar charges, provided in each case that the obligation is not for borrowed money and that the obligation secured is not overdue or, if overdue, is being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves have been established therefor;

(b)      Liens on equipment of the Borrower created solely for the purpose of securing indebtedness permitted by Section 7.5(b), representing or incurred to finance the purchase price of such property, provided that no such Lien shall extend to or cover other property of the Borrower other than the respective property so acquired, and the principal amount of indebtedness secured by any such Lien shall at no time exceed the purchase price of such property, as reduced by repayments of principal thereon;

(c)      any interest or title of a lessor under any operating lease, including the filing of UCC financing statements solely as a precautionary measure in connection with operating leases entered into by the Borrower in the ordinary course of its business:

(d)      other encumbrances not materially affecting the conduct of the Borrower's business and not securing Indebtedness: and

(e)      Liens granted in favor of the Lender pursuant to the Collateral Documents.

*Section 7.7.*      Mergers, Consolidations and Sales. The Borrower shall not be a party to any merger or consolidation or amalgamation, or sell, transfer, lease or otherwise dispose of all or substantially all of its assets. The Borrower shall not sell, transfer, refer, encumber or otherwise dispose of its legal interest in any Cases or enter into any agreement for the same or similar purpose without the written consent of the Lender; provided that the foregoing restrictions shall not apply to any Case Resolution in the ordinary course of business.

*Section 7.8.*      Loans or Advances to Employees. The Borrower shall not make, retain or have outstanding any loans or advances to (other than for travel advances and other similar cash advances made to employees in the ordinary course of business) any other Person.

*Section 7.9.*      Compliance with Laws. The Borrower shall comply in all respects with all Legal Requirements applicable to or pertaining to its business operations, including all federal, state and local attorney ethics rules and regulations relating to attorney financing.

-28-

Borrower Initials: _____
Lender Reference:  Loan Number 105

*Section 7.10.*   Use of Proceeds.  The Borrower shall use the proceeds of the Loans solely for the purposes set forth in, or otherwise permitted by, Section 5.3.

*Section 7.11.*   Maintenance of Malpractice Insurance.  During the term of this Agreement, the Borrower and Guarantors shall maintain, at their sole cost and expense, legal malpractice insurance policies issued by an insurance carrier with an A.M. Best rating of "A" or better (the "Malpractice Insurance Policies"). The Borrower and Guarantors represent and warrant that the Malpractice Insurance Policies are in full force and effect, that the amount of coverage is sufficient to cover all matters being handled by Borrower and Guarantors including the Collateral, that the Borrower and Guarantors are not in default under any of the Malpractice Insurance Policies, and that no claim for coverage thereunder has been denied under any such current Malpractice Insurance Policies with respect to any matter. At the request of the Lender, the Borrower and Guarantors shall furnish the Lender with a copy of the certificate of insurance evidencing the coverage under such Malpractice Insurance Policies and the Borrower and Guarantors agree that no such Malpractice Insurance Policies may be cancelled or the amount of coverage under such Malpractice Insurance Policies reduced without thirty (30) days prior written notice to the Lender.

*Section 7.12.*   Minimum Collateral Coverage.  Borrower shall not permit the value of the Collateral, as estimated by Lender, at any time to be less than FOUR TIMES the outstanding Indebtedness.

*Section 7.13.*   Fee Sharing and Referral Agreements.  Without the prior written approval of Lender, Borrower shall not enter into a fee sharing or referral agreement unless such agreement is entered into in the ordinary course of business and on an arms-length basis and shall not modify any fee sharing or referral agreements in any way that would reduce the fees or other amounts payable to Borrower thereunder or that would otherwise prejudice Lender.

*Section 7.14.*   Affiliate Transactions Limitation.  Without the prior written approval of Lender, Borrower shall not enter into a transaction with or make payments to its Affiliate or any Equity Partner's Affiliate.

*Section 7.15.*   Rent Increase Limitation.  If Borrower rents any real properties owned by Equity Partner, Affiliate, or Equity Partner's Affiliate, Borrower shall not increase or accept the increase of its annual rent by more than ten percent (10%) within one calendar year without the prior written approval of Lender.

SECTION 8.  EVENTS OF DEFAULT AND REMEDIES.

*Section 8.1.*   Events of Default.  Any one or more of the following shall constitute an "Event of Default" hereunder:

(a)     default in the payment when due of all or any part of the principal of or interest on the Loans (whether at the stated maturity thereof or at any other time provided for in this

-29-

Borrower Initials: _____

Lender Reference:  Loan Number 105

Agreement) or of any fee or other Obligation payable hereunder or under any other Loan Document or any default has occurred under any other agreement with the Lender;

    (b)    default in the observance or performance of any covenant set forth in Sections 7.1, 7.2, 7.3, 7.4, 7.5, 7.6, 7.7, 7.8, 7.9, 7.10, 7.11., 7.12, 7.13 or 10.2 of this Agreement;

    (c)    any representation or warranty made herein or in any other Loan Document or in any certificate furnished to the Lender pursuant hereto or thereto or in connection with any transaction contemplated hereby or thereby is determined in the sole discretion of the Lender to be untrue in any material respect as of the date of the issuance or making or deemed making thereof;

    (d)    Either (i) any event occurs or condition exists (other than those described in subsections (a) through (d) above) which is specified as an event of default under any of the other Loan Documents, or (ii) any of the Loan Documents shall for any reason not be or shall cease to be in full force and effect or is declared to be null and void, or (iii) any of the Collateral Documents shall for any reason fail to create a valid and perfected first priority Lien in favor of the Lender in any Collateral purported to be covered thereby except as expressly permitted by the terms hereof, or (iv) any Loan Party takes any action for the purpose of terminating, repudiating or rescinding any Loan Document executed by it or any of its obligations thereunder;

    (e)    default shall occur under any Indebtedness issued, assumed or guaranteed by any Loan Party in an amount in excess of $25,000, or under any indenture, agreement or other instrument under which the same may be issued, and such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such Indebtedness (whether or not such maturity is in fact accelerated), or any such Indebtedness shall not be paid when due (whether by demand, lapse of time, acceleration or otherwise);

    (f)    (i) any judgment or judgments, writ or writs or warrant or warrants of attachment, or any similar process or processes, shall be entered or filed against any Loan Party, or against any of their respective property, in an aggregate amount for all such Persons in excess of $25,000 (except to the extent fully covered by insurance pursuant to which the insurer has accepted liability therefor in writing), and which remains undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days, or any action shall be legally taken by a judgment creditor to attach or levy upon any property of any Loan Party to enforce any such judgment, or (ii) any Loan Party shall fail within thirty (30) days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

    (g)    any Change of Control shall occur; or the death or legal incompetence of any Guarantor shall occur;

Borrower Initials: _____

Lender Reference:  Loan Number 105

(h)     any Loan Party shall (i) have entered involuntarily against it an order for relief under the United States Bankruptcy Code, as amended, (ii) not pay, or admit in writing its inability to pay, its debts generally as they become due, (iii) make an assignment for the benefit of creditors, (iv) apply for, seek, consent to or acquiesce in, the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for it or any substantial part of its property, (v) institute any proceeding seeking to have entered against it an order for relief under the United States Bankruptcy Code, as amended, to adjudicate it insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any Law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, (vi) take any corporate or similar action in furtherance of any matter described in parts (i) through (v) above, or (vii) fail to contest in good faith any appointment or proceeding described in Section 8.1(j);

(i)     a custodian, receiver, trustee, examiner, liquidator or similar official shall be appointed for any Loan Party, or any substantial part of any of its property, or a proceeding described in Section 8.l(i)(v) shall be instituted against any Loan Party, and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of thirty (30) days;

(j)     the Borrower's engagement with the client is terminated for any reason (whether initiated by the Borrower. the client or legal process other than Adverse Case Resolution) with respect to more than five percent (5.00%) of Cases (a "*Client Termination*"); or

(k)     any Equity Partner's ownership in the Borrower is terminated for any reason.

*Section 8.2.*     Non-Bankruptcy Defaults.     When any Event of Default (other than those described in subsections (i) or (j) of Section 8.1 with respect to the Borrower) has occurred and is continuing, the Lender may, by written notice to the Borrower, declare the principal of and the accrued interest on the Loans to be forthwith due and payable and thereupon the Loans, including both principal and interest thereon, shall be and become immediately due and payable together with all other amounts payable under the Loan Documents without further demand, presentment, protest or notice of any kind. In addition, the Lender may exercise all rights and remedies available to it under the Loan Documents or applicable Law or equity when any such Event of Default has occurred and is continuing. Without limiting the foregoing, the Lender may, if it so elects, seek in arbitration or in any court where the borrower resides or the collateral is located the appointment of a receiver or keeper to take possession of the Collateral and to enforce any of the Lender's remedies, without prior notice or hearing as to such appointment. If a receiver or keeper is sought in arbitration to take possession of the Collateral and to enforce any of the Lender's remedies, the arbitrator shall grant such relief. If Borrower is in default, Lender, among other rights, has the right to place Borrower in involuntary bankruptcy.

*Section 8.3.*     Bankruptcy Defaults.     When any Event of Default described in subsections (i) or (j) of Section 8.1 with respect to the Borrower has occurred and is continuing,

-31-

Borrower Initials: _____

Lender Reference: Loan Number 105

then the Loans shall immediately become due and payable together with all other amounts payable under the Loan Documents without presentment, demand, protest or notice of any kind. In addition, the Lender may exercise all rights and remedies available to it under the Loan Documents or applicable Law or equity when any such Event of Default has occurred and is continuing, subject to the United States Bankruptcy Code where applicable and subject to Section 9.7.

## SECTION 9.  THE GUARANTEES.

*Section 9.1.*    The Guarantees.  To induce the Lender to provide the Loans described herein and in consideration of benefits expected to accrue to the Borrower by reason of the Loans and for other good and valuable consideration, receipt of which is hereby acknowledged, each Equity Partner of the Borrower party hereto (including any Equity Partner executing an Additional Guarantor Supplement in the form attached hereto as Exhibit C or such other form acceptable to the Lender) hereby unconditionally and irrevocably guarantees jointly and severally to the Lender, the due and punctual payment of all present and future Obligations, including, but not limited to, the due and punctual payment of principal of and interest on the Loans, and the due and punctual payment of all other Obligations now or hereafter owed by the Borrower under the Loan Documents, in each case as and when the same shall become due and payable, whether at stated maturity, by acceleration, or otherwise, according to the terms hereof and thereof (including all interest, costs, fees, and charges after the entry of an order for relief against the Borrower or such other obligor in a case under the United States Bankruptcy Code or any similar proceeding, whether or not such interest, costs, fees and charges would be an allowed claim against the Borrower or any such obligor in any such proceeding).

*Section 9.2.*    Guarantee Unconditional.  The obligations of each Guarantor under this Section 9 shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged, or otherwise affected by:

(a)    any full or limited extension, renewal, settlement, compromise, waiver, or release in respect of any obligation of any Loan Party or other obligor or of any other guarantor under this Agreement or any other Loan Document or by operation of Law or otherwise;

(b)    any modification or amendment of or supplement to this Agreement or any other Loan Document;

(c)    any change in the corporate existence, structure, or ownership of, or any insolvency, bankruptcy, reorganization, or other similar proceeding affecting, any Loan Party or other obligor, any other guarantor, or any of their respective assets, or any resulting release or discharge of any obligation of any Loan Party or other obligor or of any other guarantor contained in any Loan Document;

-32-

Borrower Initials: ____/____
Lender Reference:  Loan Number 105

(d)      the existence of any claim, set-off, or other rights which any Loan Party or other obligor or any other guarantor may have at any time against the Lender or any other Person, whether or not arising in connection herewith;

(e)      any failure to assert, or any assertion of, any claim or demand or any exercise of, or failure to exercise, any rights or remedies against any Loan Party or other obligor, any other guarantor, or any other Person or property;

(f)      any application of any sums by whomsoever paid or howsoever realized to any obligation of any Loan Party or other obligor, regardless of what obligations of any Loan Party or other obligor remain unpaid;

(g)      any invalidity or unenforceability relating to or against any Loan Party or other obligor or any other guarantor for any reason of this Agreement or of any other Loan Document or any provision of applicable Law or regulation purporting to prohibit the payment by any Loan Party or other obligor or any other guarantor of the principal of or interest on any Loan or any other amount payable under the Loan Documents; or

(h)      any other act or omission to act or delay of any kind by the Lender or any other Person or any other circumstance whatsoever that might, but for the provisions of this subsection, constitute a legal or equitable discharge of the obligations of any Guarantor.

Section 9.3.    Discharge Only upon Payment in Full; Reinstatement in Certain Circumstances. Each Guarantor's obligations under this Section 9 shall remain in full force and effect until the principal of and interest on the Loans and all other amounts payable by the Borrower and the other Loan Parties under this Agreement and all other Loan Documents shall have been paid in full. If at any time any payment of the principal of or interest on any Loan or any other amount payable by any Loan Party or other obligor or any guarantor under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, or reorganization of such Loan Party or other obligor or of any guarantor, or otherwise, each Guarantor's obligations under this Section 9 with respect to such payment shall be reinstated at such time as though such payment had become due but had not been made at such time.

Section 9.4.    Subrogation. Each Guarantor agrees it will not exercise any rights which it may acquire by way of subrogation by any payment made hereunder, or otherwise, until all the Obligations shall have been paid in full. If any amount shall be paid to a Guarantor on account of such subrogation rights at any time prior to the payment in full of the Obligations and all other amounts payable by the Loan Parties hereunder and the other Loan Documents, such amount shall be held in trust for the benefit of the Lender and shall forthwith be paid to the Lender or be credited and applied upon the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement.

-33-

Borrower Initials: _____
Lender Reference:  Loan Number 105

*Section 9.5.*    Subordination.  Each Guarantor (each referred to herein as a "Subordinated Creditor") hereby subordinates the payment of all indebtedness, obligations, and liabilities of the Borrower or other Loan Party owing to such Subordinated Creditor, whether now existing or hereafter arising, to the indefeasible payment in full in cash of all Obligations.   During the existence of any Event of Default, subject to Section 9.4, any such indebtedness, obligation, or liability of the Borrower or other Loan Party owing to such Subordinated Creditor shall be enforced and performance received by such Subordinated Creditor as trustee for the benefit of the holders of the Obligations and the proceeds thereof shall be paid over to the Lender for application to the Obligations (whether or not then due), but without reducing or affecting in any manner the liability of such Guarantor under this Section 9.

*Section 9.6.*    Waivers.   Each Guarantor agrees that each guaranty being given is a continuing, absolute, and unconditional guaranty and may be enforced without first resorting to collection from the Borrower or resorting to any security or other property or invoking other rights or remedies.  Each Guarantor irrevocably waives acceptance hereof, presentment, demand, notice of non-payment, protest, notice of protest, impairment of collateral, release of collateral, notice of acceleration, and any notice not provided for herein, as well as any requirement that at any time any action be taken by the Lender or any other Person against the Borrower or any other Loan Party or other obligor, another guarantor, or any other Person.  For the avoidance of doubt, each Guarantor agrees and understands that Lender may enforce any or all of the Guarantees without first attempting any notice of default or collection efforts against Borrower.  Borrower understands and agrees that Lender proceeding against any Guarantor will never be a waiver of any of Lender's rights against Borrower.

*Section 9.7.*    Stay of Acceleration.  If acceleration of the time for payment of any amount payable by the Borrower or other Loan Party or other obligor under this Agreement or any other Loan Document is stayed upon the insolvency, bankruptcy or reorganization of the Borrower or such other Loan Party or obligor, all such amounts otherwise subject to acceleration under the terms of this Agreement or the other Loan Documents shall nonetheless be payable by the Guarantors hereunder forthwith on demand by the Lender.

*Section 9.8.*    Benefit to Guarantors.   Each Guarantor will derive substantial direct and indirect benefit from the extensions of credit hereunder, and each Guarantor acknowledges that this guarantee is necessary or convenient to the conduct, promotion and attainment of its business.  In consideration of the benefits accruing to each Guarantor, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Guarantor shall execute a Security Agreement granting Lender a lien on and security interest in all right, title, and interest of the Guarantor, whether now owned or existing or hereafter created, acquired, or arising, in and to the collateral described therein.

*Section 9.9.*    Transfers of Guarantor Property.  Each Guarantor agrees that it will not transfer any asset worth more than $10,000.00 while any Indebtedness remains outstanding under

-34-

Borrower Initials: _____

Lender Reference:  Loan Number 105

the Loan Agreement, and will not transfer any asset of any value if there is an existing Event of Default under the Loan Agreement.

*Section 9.10.*   Personal Assets Lien.   If the value of Borrower's real property, personal property, and fixtures, including all of the projected Law Firm Proceeds of all Cases and all proceeds thereof, but excluding any Excluded Property, at any time is less than FOUR TIMES the outstanding Indebtedness, the Obligations shall be secured by valid, perfected, and enforceable Liens on all right, title, and interest of the Equity Partners in all of their personal assets, whether now owned or hereafter acquired, and all proceeds thereof. The Equity Partners acknowledge and agree that the Liens on their personal assets shall be granted to the Lender and shall be valid and perfected first priority Liens, in each case pursuant to one or more Collateral Documents from such Persons, each in form and substance satisfactory to the Lender; provided that until a Default has occurred and the Lender shall have requested, the Equity Partners shall not be required to execute and deliver mortgages with respect to their real property. When, if ever, Lender requests that Equity Partners deliver a mortgage with respect to any of its real property, Equity Partners shall deliver such fully-executed mortgage to Lender, in form and substance satisfactory to the Lender, within ten (10) days of Lender's request. Upon any Equity Partner's failure to deliver such fully-executed mortgage to Lender within ten (10) days of Lender's request, if any, such Equity Partner(s) hereby grants Lender a limited power of attorney to execute the mortgage on the Equity Partner's behalf, to record the fully-executed mortgage in the real property records, to execute any and all other required documents on behalf of any Equity Partners to accomplish recordation of the mortgage, and, if default is not cured, to proceed with foreclosure on the mortgage by any methods allowed by the state in which the real property is located.

### SECTION 10. COLLATERAL.

*Section 10.1.*   Collateral.   The Obligations shall be secured by valid, perfected, and enforceable Liens on all right, title, and interest of the Borrower in all of its real property, personal property, and fixtures, including all of the Law Firm Proceeds of all Cases, whether now owned or hereafter acquired, and all proceeds thereof, but excluding any Excluded Property. The Borrower acknowledges and agrees that the Liens on the Collateral shall be granted to the Lender and shall be valid and perfected first priority Liens, in each case pursuant to one or more Collateral Documents from such Persons, each in form and substance satisfactory to the Lender; provided that until a Default has occurred and the Lender shall have requested, the Borrower shall not be required to deliver a mortgage with respect to any of its real property. When, if ever, Borrower is requested by Lender to deliver a mortgage with respect to any of its real property, Borrower will deliver such fully-executed mortgage to Lender, in form and substance satisfactory to the Lender, within ten (10) days of Lender's request. Upon Borrower's failure to deliver such fully-executed mortgage to Lender within ten (10) days of Lender's request, if any, Borrower hereby grants Lender an irrevocable limited power of attorney which is coupled with an interest to execute the mortgage on the Borrower's behalf, to record the fully-executed mortgage in the real property records, to execute any and all other required documents on behalf of the Borrower to accomplish recordation of the mortgage, and, if default is not cured, to proceed with foreclosure on the

-35-

mortgage by any methods allowed by the state in which the real property is located. Borrower authorizes Lender to file UCC-1 financing statements to set up liens on all Borrower's real property, personal property, and fixtures, including all of the Law Firm Proceeds of all Cases.

    *Section 10.2.*   Direction of Proceeds; Depository Banks.

    (a)    *Operating Accounts.*   All deposit accounts of the Borrower on the date hereof are listed and identified (by account number, account type and depository institution) on Schedule 10.2. The Borrower shall promptly notify the Lender of any other deposit account opened or maintained by the Borrower after the date hereof, and shall submit to the Lender a supplement to Schedule 10.2 to reflect such additional accounts (provided the Borrower's failure to do so shall not impair the Lender's security interest therein). With respect to each deposit account (defined as the *"Operating Accounts"* whether or not Borrower uses such deposit accounts to operate its business) and as a condition to the establishment and maintenance of any such Operating Account, the Borrower, the depository institution, and the Lender shall execute and deliver an account control agreement (a *"Control Agreement"*) in form and substance satisfactory to the Lender which provides, among other things, for the depository institution's agreement that it will comply with instructions originated by the Lender directing the disposition of the funds in such Operating Account without further consent by the Borrower; *provided* that with respect to any Operating Accounts in existence on the Closing Date, the Borrower shall deliver such Control Agreements within thirty (30) Business Days (or such longer time period as determined by the Lender in its sole discretion) of the Closing Date. Borrower shall maintain an authorization for electronic funds transfer by Lender from the Operating Accounts. Lender may authorize an electronic funds transfer of any funds for any Obligations that are not paid to Lender when such Obligations are due and payable. Any funds in which the Borrower somehow has no interest that are transferred from the Operating Account by Lender shall be promptly refunded to the Operating Account by Lender upon notice and proof that Borrower had no interest in the transferred funds. Borrower hereby gives Lender permission to contact and obtain information from all banks where Borrower maintains accounts.

    (b)    *IOLTA Account.*   If directed by Lender, within five (5) Business Days of the Closing Date and at Borrower's sole expense, the Borrower shall direct the bank or other financial institution where the Borrower maintains its Interest on Lawyer's Trust Account (*"IOLTA Account"*) to permit Lender to have electronic viewing access to the IOLTA Account by using the financial institution's online system. The Borrower agrees to undertake all necessary actions as may be required and provide all necessary authorizations in order to allow and permit Lender to have such access to the IOLTA Account. As part of Borrower's foregoing obligation, Borrower shall send a written authorization (*"Letter of Authorization"*) to the appropriate financial institution to permit such access until further notice. A form of this Letter of Authorization is attached hereto as Exhibit F. The Borrower shall not revoke the Letter of Authorization until the Obligations have been paid in full or by prior written agreement with the Lender. The Borrower agrees to undertake any additional actions as required by the holder of the IOLTA Account to permit such access and authorization, including entering into additional agreements with such

-36-

financial institution. Any funds in which the Borrower has no interest that are transferred from the IOLTA Account by Lender shall be promptly refunded to the IOLTA Account by Lender upon notice and proof that Borrower had no interest in the transferred funds.

(c)   *After an Event of Default.* Borrower hereby grants Lender a power of attorney to, after an Event of Default, direct the banks on the Borrower's behalf transfer all the monies in the Operating Accounts and IOLTA Account to accounts at different banks of Lender's choosing and to execute any and all documents on behalf of the Borrower to accomplish these transfers.

*Section 10.3.*   Additional Lender Protections.   Upon request by Lender, Borrower shall, within ten (10) days, notify in writing the clients, the opposing parties' attorneys, the opposing parties' insurers, and also, if requested by Lender, the courts with respect to each of the Cases Borrower is handling that Lender has a lien on and right to direct payment of Borrower's account receivable/contingency interest in any and all recoveries or settlement proceeds received or to be received by the clients. Lender shall also have the right, as attorney in fact for the Borrower, to give any or all of the foregoing notices on any or all Cases of the Borrower, and Lender shall also have the right to intervene in any Cases if Borrower is in Default solely to protect Lender's lien upon Borrower's interest in the lawsuit, subject to the terms of Section 2.8. Borrower further conveys and assigns to Lender all contractual, statutory, and common law rights to charging liens against Cases or proceeds of Cases.

*Section 10.4.*   Further Assurances.   The Borrower agrees that it shall, from time to time at the request of the Lender, execute and deliver such documents and do such acts and things as the Lender may reasonably request in order to provide for or perfect or protect such Liens on the Collateral or otherwise carry out the terms of this Agreement. Upon the Borrower making a new Equity Partner, the Borrower shall promptly thereafter cause such new Equity Partner to execute a Guaranty Agreement, and the Loan Parties shall also deliver to the Lender, or cause such Equity Partner to deliver to the Lender, at the Borrower's cost and expense, such other instruments, documents, certificates, and opinions reasonably required by the Lender in connection therewith.

SECTION 11.  MISCELLANEOUS.

*Section 11.1.*   Notices.

(a)   *Notices Generally.*   Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered either electronically via email, by hand or overnight courier service, mailed by certified or registered mail as follows:

(i)   if to the Borrower or any other Loan Party, to McClenny Moseley & Associates, PLLC, Attention of John Zachery Mosely and James Marshall McClenny, 415 Louisiana Street, Suite 2900, Houston, Texas 77002.

-37-

of the Lender in connection with (a) establishing and maintaining access to the IOLTA (including, but not limited to, set-up, documentation, or other bank charges, or attorneys' fees and expenses), and

(b)      any subsequent consents hereunder or waivers or amendments hereto or thereto, including the reasonable fees and expenses of counsel for the Lender with respect to all of the foregoing (whether or not the transactions contemplated by any such waiver or amendment are consummated). The Borrower further agrees to pay to the Lender or any other holder of the Obligations all costs and expenses (including but not limited to court costs, arbitration costs, mortgage recording and any other recording fees or expenses, and reasonable attorneys' fees), if any, incurred or paid by the Lender or any other holder of the Obligations in connection with any Default or Event of Default or in connection with the enforcement of this Agreement or any of the other Loan Documents or any other instrument or document delivered hereunder or thereunder (including, without limitation, all such costs and expenses incurred in connection with any proceeding under the United States Bankruptcy Code involving the Borrower or any guarantor). THE BORROWER FURTHER AGREES TO INDEMNIFY THE LENDER, LENDER'S COUNSEL, AND ANY SECURITY TRUSTEE, AND THEIR RESPECTIVE DIRECTORS, LAWYERS, OFFICERS AND EMPLOYEES (COLLECTIVELY "LENDER PARTIES"), AGAINST ALL LOSSES, CLAIMS, DAMAGES, PENALTIES, JUDGMENTS, LIABILITIES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ALL EXPENSES OF LITIGATION OR PREPARATION THEREFOR, WHETHER OR NOT THE INDEMNIFIED PERSON IS A PARTY THERETO) WHICH ANY OF THEM MAY PAY OR INCUR ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREBY OR THE DIRECT OR INDIRECT APPLICATION OR PROPOSED APPLICATION OF THE PROCEEDS OF ANY EXTENSION OF CREDIT MADE AVAILABLE HEREUNDER, INCLUDING, WITHOUT LIMITATION, FOR ANY LENDER PARTY'S OR LENDER PARTIES' OWN NEGLIGENCE OR STRICT LIABILITY, OTHER THAN THOSE WHICH ARISE FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PARTY CLAIMING INDEMNIFICATION. The Borrower, upon demand by the Lender at any time, shall reimburse the Lender for any legal or other expenses incurred in connection with investigating or defending against any of the foregoing except if the same is directly due to the gross negligence or willful misconduct of the party to be indemnified. The obligations of the Borrower under this section shall survive the termination of this Agreement.

(c)      All amounts due under this section shall be payable within five (5) Business Days after demand therefor.

(d)      Each party's obligations under this section shall survive the termination of the Loan Documents and payment of the obligations hereunder.

*Section 11.4.* No Waiver, Cumulative Remedies. No delay or failure on the part of the Lender or on the part of the holder or holders of any of the Obligations in the exercise of any power or right under any Loan Document shall operate as a waiver thereof or as an acquiescence in any default, nor shall any single or partial exercise of any power or right preclude any other or further exercise thereof or the exercise of any other power or right. The rights and remedies hereunder of

-39-

Borrower Initials: _____

Lender Reference: Loan Number 105

the Lender and of the holder or holders of any of the Obligations are cumulative to, and not exclusive of, any rights or remedies which any of them would otherwise have.

*Section 11.5.* Survival of Representations. All representations and warranties made herein or in any other Loan Document or in certificates given pursuant hereto or thereto shall survive the execution and delivery of this Agreement and the other Loan Documents, and shall continue in full force and effect with respect to the date as of which they were made as long as any credit is in use or available hereunder.

*Section 11.6.* Survival of Indemnities. All indemnities and other provisions relative to reimbursement to the Lender of amounts sufficient to protect the yield of the Lender with respect to the Loans, including, but not limited to, Section 11.3, shall survive the termination of this Agreement and the other Loan Documents and the payment of the Obligations.

*Section 11.7.* Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Lender, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (e.g., "pdf", "jpg" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement, and Borrower shall also send the blue ink original signatures to Lender and its counsel, as directed. All Loan Documents shall be deemed executed in the State of Delaware and be delivered to and held in trust by Custodian.

*Section 11.8.* Headings. Section headings used in this Agreement are for reference only and shall not affect the construction of this Agreement.

*Section 11.9.* Severability of Provisions. Any provision of any Loan Document which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. All rights, remedies and powers provided in this Agreement and the other Loan Documents may be exercised only to the extent that the exercise thereof does not violate any applicable mandatory provisions of Law, and all the provisions of this Agreement and other Loan Documents are intended to be subject to all applicable mandatory provisions of Law which may be controlling and to be limited to the extent necessary so that they will not render this Agreement or the other Loan Documents invalid or unenforceable.

-40-

Borrower Initials:

Lender Reference: Loan Number 105

*Section 11.10.* Construction.  The parties acknowledge and agree that the Loan Documents shall not be construed more favorably in favor of any party hereto based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation of the Loan Documents.  Each Loan Party acknowledges that it has had access to counsel and advisors of its own choice in negotiations leading up to execution of this Agreement.  **Each Loan Party acknowledges that (a) it has conducted such investigation and inquiry that it, in its sole discretion, deems necessary and in executing this Agreement, (b) no Loan Party is relying or acting upon any statement, advice, representation, act or omission of the Lender or Lender Parties and (c) no Loan Party has been influenced to any extent in entering in this Agreement by any statements made by any other party.**  Each Loan Party has read this Agreement and has had the Agreement fully explained to it by its counsel or has waived its right to do so.  Nothing contained herein shall be deemed or construed to permit any act or omission which is prohibited by the terms of any Collateral Document, the covenants and agreements contained herein being in addition to and not in substitution for the covenants and agreements contained in the Collateral Documents.

*Section 11.11.* Excess Interest.  Notwithstanding any provision to the contrary contained herein or in any other Loan Document, no such provision shall require the payment or permit the collection of any amount of interest in excess of the maximum amount of interest permitted by applicable Law in the State of Borrower's principal place of business as set forth in the preamble (after giving effect to any separate usury waiver that the Borrower may have delivered to the Lender and only if Delaware law is determined not to be applicable) to be charged for the use or detention, or the forbearance in the collection, of all or any portion of the Loans or other obligations outstanding under this Agreement or any other Loan Document ("*Excess Interest*").  If any Excess Interest is provided for, or is adjudicated to be provided for, herein or in any other Loan Document, then in such event (a) the provisions of this Section shall govern and control, (b) neither the Borrower nor any guarantor or endorser shall be obligated to pay any Excess Interest, (c) any Excess Interest that the Lender may have received hereunder shall, at the option of the Lender, be (i) applied as a credit against the then outstanding principal amount of Obligations hereunder and accrued and unpaid interest thereon (not to exceed the maximum amount permitted by applicable Law), (ii) refunded to the Borrower, or (iii) any combination of the foregoing, (d) the interest rate payable hereunder or under any other Loan Document shall be automatically subject to reduction to the maximum Lawful contract rate allowed under applicable usury Laws (the *"Maximum Rate"*), and this Agreement and the other Loan Documents shall be deemed to have been, and shall be, reformed and modified to reflect such reduction in the relevant interest rate, and (e) neither the Borrower nor any guarantor or endorser shall have any action against the Lender for any damages whatsoever arising out of the payment or collection of any Excess Interest.  Notwithstanding the foregoing, if for any period of time interest on any of the Borrower's Obligations is calculated at the Maximum Rate rather than the applicable rate under this Agreement, and thereafter such applicable rate becomes less than the Maximum Rate, the rate of interest payable on the Borrower's Obligations shall remain at the Maximum Rate until the Lender has received the amount of interest which the Lender would have received during such period on the Borrower's Obligations had the rate of interest not been limited to the Maximum Rate during such period.

-41-

Borrower Initials: _____

Lender Reference:  Loan Number 105

*Section 11.12.* Independent Evaluation of Loan Parties; No Advisory or Fiduciary Responsibility of Lender.

(a)     The Loan Parties acknowledge and agree that: (i) the Borrower is a law firm and each of its attorneys, including each of the Guarantors, is both sophisticated in the practice of law and also experienced in borrowing funds to finance litigation expenses; (ii) in reaching their decision to enter into this Agreement, they completed an independent evaluation of both this Agreement and the other Loan Documents, and as such, they understand, acknowledge and accept their respective terms and conditions, as well as any potential risks associated with the transactions contemplated hereby; and (iii) they are relying on their own independent evaluation or the evaluation of their independent advisors and not on the advice of the Lender, or its respective affiliates, partners, members, officers, equity owners, agents, employees or other representatives, as the basis to inform their decision to enter into this Agreement and the transactions contemplated herein.

(b)     In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges its understanding that: (i) other than the express trusts created herein, no fiduciary, advisory or agency relationship between any Loan Party and the Lender is intended to be or has been created in respect of the transactions contemplated hereby or by the other Loan Documents, irrespective of whether the Lender has advised or is advising any Loan Party on other matters; (ii) the arranging and other services regarding this Agreement provided by the Lender are arm's-length commercial transactions between such Loan Parties, on the one hand, and the Lender, on the other hand; and (iii) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent that it has deemed appropriate to the best of its legal and business judgment.

(c)     In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party further acknowledges its understanding that: (i) the Lender has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Loan Party or any of its Affiliates, or any other Person; (ii) the Lender has no obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Lender and its respective Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of any Loan Party, and the Lender has no obligation to disclose any of such interests to any Loan Party or its Affiliates; and (iv) the Lender has not solicited any clients for the Borrower and has not recommended any clients to the Borrower. To the fullest extent permitted by Law, each Loan Party hereby waives and releases any claims that it may have against the Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

*Section 11.13.* Binding Nature.

-42-

This Agreement shall be binding upon the Borrower and its successors and assigns, and shall inure to the benefit of the Lender and the benefit of its successors and assigns, including any subsequent holder of the Obligations. The Borrower may not assign its rights hereunder without the written consent of the Lender. This Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby.

Section 11.14. Governing Law.

THIS AGREEMENT, THE NOTES AND THE OTHER LOAN DOCUMENTS, AND THE RIGHTS AND DUTIES OF THE PARTIES HERETO AND THERETO, AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER ARISING HEREUNDER OR THEREUNDER, SHALL BE CONSTRUED AND DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THAT WOULD OR COULD REQUIRE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. THE LOAN PARTIES ARE SOPHISTICATED ATTORNEYS, AND THEY ACKNOWLEDGE AND AGREE THAT DELAWARE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THIS LOAN AGREEMENT TRANSACTION.

Section 11.15. Waiver of Jury Trial; Binding Arbitration.

(a)    This section concerns the resolution of any controversies or claims between the parties, whether arising in contract, tort, by statute, or otherwise, including but not limited to controversies or claims that arise out of or relate to (i) this Agreement, (ii) any Loan Document, or (iii) the transactions contemplated hereby or thereby (collectively a "*Claim*"). **THE PARTIES IRREVOCABLY AND VOLUNTARILY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT.**

(b)    Any and all Claims arising out of or relating in any way to this Agreement or any other Loan Document or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement or any other Loan Document shall be submitted to final and binding arbitration before Judicial Arbitration and Mediation Services, Inc. ("JAMS"). The arbitration shall take place in Wilmington, Delaware and shall be conducted in accordance with the provisions of JAMS Comprehensive Arbitration Rules and Procedures ("JAMS Rules"), or any similar successor, in effect at the time of the filing of the demand for arbitration.

(c)    The arbitration shall be held before and decided by one neutral arbitrator (the "Arbitrator") selected in accordance with Rule 15 of the JAMS Rules. In the event there are more than two (2) parties to the arbitration, the Lender shall collectively be considered one side (the "Lender Side, and any other parties to the arbitration shall collectively be considered the other side (the "Borrower Side"). If the Lender is not a party to the arbitration, the claimant(s) shall

-43-

Borrower Initials: ~~aval/~~

Lender Reference:  Loan Number 105

collectively be considered one side, and the respondent(s) shall collectively be considered one side.   The Arbitrator shall serve as neutral, independent and impartial arbitrator and shall agree to use best efforts to cause the issuance of a ruling in respect of such arbitration within sixty (60) days of appointment of the Arbitrator.  The Arbitrator shall not be told whether he or she was selected by a particular side.  Where a demand for arbitration is submitted between the Lender Side and the Borrower Side, and the Lender Side and the Borrower Side are already involved in other arbitral proceedings pending under the JAMS Rules, (i) JAMS shall refer that new case to the Arbitrator already selected for the existing proceedings, or (ii) if the Arbitrator has not yet been selected for the existing proceedings then a single Arbitrator shall be selected for all arbitral proceedings pending under the JAMS Rules between any parties hereto as set forth herein.  JAMS and the parties hereto shall proceed in the same way when a demand for arbitration is submitted between the Lender Side and the Borrower Side even if the parties hereto are not identical to the parties in the existing arbitral proceedings.  Where JAMS refers the new case to an existing arbitrator, the parties to the new case will be deemed to have waived their right to designate an arbitrator.  The parties hereto agree to participate in the arbitration in good faith and to use best efforts to cause the Arbitrator to issue his or her ruling within sixty (60) days of the appointment of the Arbitrator.  The Arbitrator shall have the power to award any appropriate remedy allowed by applicable Law, but shall not have power to modify the provisions of this Section 11.15 to make an award or impose a remedy that is not available to a state or federal court of general jurisdiction in the State of Delaware or any state where enforcement can be obtained against a Loan Party or its assets, and the jurisdiction of the Arbitrator is limited accordingly.  The Arbitrator may issue preliminary injunctive relief, permanent injunctive relief, extraordinary relief, or other equitable relief, and may specifically enforce this Agreement or any other loan Document.  In deciding any motion for injunctive relief, the Arbitrator shall apply general federal standards for issuing injunctive relief rather than the standards applicable to Delaware courts.  The Arbitrator may proceed with a default award against a party that fails to comply with JAMS Rules or fails to appear.  The fees and costs of the Arbitrator, the pre-arbitration Events of Default, and the arbitration (but not the parties' individual costs of conducting the arbitration) shall initially be borne equally by the parties involved in the arbitration.  The Arbitrator shall award to the prevailing party, if any, the prevailing party's share of the fees and costs of the Arbitrator and arbitration.  In any arbitration arising out of or related to this Agreement or any other Loan Document, the Arbitrator shall award to the prevailing party, if any, its attorneys' fees, costs, and expenses reasonably incurred in connection with the arbitration, in connection with enforcing the loan documents after a breach but prior to an arbitration action, in connection with any receivership, injunctive relief, or other necessary or required court action prior to or in concurrence with the arbitration, in connection with confirming the arbitration award in a court, in connection with enforcing the receivership, award, and judgment, in connection with protecting the Lender's rights to the Collateral, in the confirmation of any arbitration award, domestication of any judgment, and in any and all litigation in connection with the rights and obligations under this Agreement or any other Loan Document, including any appeals and any judicial foreclosure actions.  Adequate discovery shall be permitted by the Arbitrator consistent with the objectives of arbitration.  The award of the Arbitrator, which shall be a simple award, shall be final and binding upon the parties (subject only to limited review as required by Law) and may be entered as a

-44-

judgment in any state or federal court in the state of Delaware, in any jurisdiction where the non-prevailing party or the assets of the non-prevailing party may be found, in any jurisdiction where the non-prevailing party resides, in any jurisdiction where the non-prevailing party has personal property or Collateral, and in any other court having competent jurisdiction. The parties hereto hereby submit to the jurisdiction of any state or federal court in any jurisdiction where the non-prevailing party or the assets of the non-prevailing party may be found. If a receiver or keeper is sought in arbitration to take possession of the Collateral and to enforce any of the Lender's remedies consistent with this Agreement or any other Loan Document, the arbitrator shall grant such relief. The details, existence and outcome of any such arbitration and any information obtained in connection with any such arbitration (including any discovery taken in connection with such arbitration) shall be kept strictly confidential and shall not be disclosed or discussed with any person not a party to, or witness in, the arbitration; *provided* that a party may make such disclosures as are required by applicable Law or legal process; *provided further* that a party may make such disclosures to it or its attorneys, accountants, investors or other agents and representatives who reasonably need to know the disclosed information in connection with any arbitration pursuant to this Section 11 and who are obligated to keep such information confidential to the same extent as such party; and *provided further* that a party may make such disclosures to the extent necessary to confirm, domesticate, or enforce any arbitration award. If any party hereto receives a subpoena or other request for information from a third party that seeks disclosure of any information that is required to be kept confidential pursuant to the immediately preceding sentence, or otherwise believes that it may be required to disclose any such information, such party shall (i) promptly notify the other parties to the arbitration and (ii) reasonably cooperate with such other parties in taking any legal or otherwise appropriate actions, including the seeking of a protective order, to prevent the disclosure or otherwise protect the confidentiality, of such information.

(d)     Both parties hereby agree to amend JAMS Comprehensive Arbitration Rules & Procedures Rule 22(j) to allow for a default award in the event that the respondent to a claim does not respond to the service of process by filing an answer. If the respondent does not file an answer within twenty (20) days after service of process, then the respondent waives any right to an oral hearing and consents to submission of the dispute to the Arbitrator for proceedings for a default award based solely on written submissions by the claimant. The Arbitrator must determine that service of process was proper according to Section 11.1 of this Agreement. Once the Arbitrator determines service of process was proper, the Arbitrator must, upon claimant's submission of sufficient written evidence of damages, render a default award for the claimant in the requested amount and for the requested relief as is allowed without a hearing in order to avoid undue expense and delay to the claimant. All written evidence must include a sworn statement by the claimant and a business record affidavit or other authentication for all documentation. Upon a final award, the Arbitrator shall mail a written notice to the respondent notifying the respondent of the award.

(e)     Notwithstanding the foregoing, a party may seek an order from a state or federal court sitting in New Castle County, Delaware or other court in a jurisdiction where the respondent or respondent assets are located for preliminary injunctive relief or a temporary restraining order to the extent necessary pending the appointment of an arbitrator. Any injunction issued by such

-45-

court shall expire upon the earlier of (i) an order of the arbitrator terminating such injunction, or (ii) sixty (60) days after the Arbitrator is appointed (subject to the Arbitrator's discretion to extend the duration of any such injunction). Seeking a preliminary injunction or temporary restraining order pending the Arbitrator's appointment shall not be deemed a waiver of the right to arbitrate or to compel arbitration. The parties hereto hereby submit to the jurisdiction of the courts sitting in New Castle County, Delaware and agree that venue is proper therein (and waive any objection to such venue) for the purpose of compelling arbitration or seeking preliminary relief as expressly set forth herein. The Lender may seek relief in any state or federal court where any Collateral or Lien assets are located prior to or pending arbitration if reasonably necessary to protect or preserve Collateral, Liens, or Lender's lien on Collateral. Seeking relief to protect or preserve Collateral, Liens, or Lender's lien on Collateral shall not be deemed a waiver of the right to arbitrate or to compel arbitration.

(f)      The Borrower irrevocably consents to the service of process for arbitration or other legal proceedings in the manner provided for Notices (including email notices) pursuant to Section 11.1 of this Agreement and agrees that nothing in this Agreement or any other Loan Document will affect the right of the Lender to serve process in any other manner permitted by Law.

(g)      The Borrower understands and irrevocably agrees that nothing in this section shall be construed to preclude the Lender from enforcing against the Collateral, with or without judicial process, any remedy provided under any credit document or any right, remedy or power of a secured party under Article 9 of the UCC, including, without limitation, taking possession of, disposing of or otherwise foreclosing on any Collateral.

(h)      Each Loan Party hereby knowingly, irrevocably and unconditionally waives, to the fullest extent permitted by applicable Law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in Delaware. Each party hereto hereby knowingly and irrevocably waives, to the fullest extent permitted by applicable Legal Requirements, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court or arbitral body.

*Section 11.16.* Future Financing. It is the intent of the Borrower and Lender to have an ongoing borrowing and lending relationship and, therefore, the Borrower agrees that if it intends to obtain financing in the future that is similar in nature to the Loans contemplated by this Agreement, then Lender shall have the right to provide such future financing on equal or better terms than those the Borrower has obtained in good faith. In the event that the Borrower obtains from a third party (or multiple third parties) in good faith a term sheet, commitment letter or other document reflecting transaction terms that the Borrower desires to accept, the Borrower shall first provide such document to the Lender and the Lender shall evaluate the collateral for such proposed financing and the terms thereof and, within fourteen (14) Business Days of receipt thereof, advise the Borrower if the Lender is amenable to granting a loan upon substantially the same or better terms. In the event the Lender agrees to provide such new financing in writing, the Borrower and

-46-

Borrower Initials: _____

Lender Reference:  Loan Number 105

the Lender shall enter into such financing on substantially the same terms and conditions.  Nothing in this Section 11.16 shall obligate the Lender to make additional loans or provide any additional financing to the Borrower.

Section 11.17.  USA Patriot Act.  The Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into Law October 26, 2001)) (the "Act"), it is required to obtain, verify, and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Lender to identify the Borrower in accordance with the Act.

Section 11.18.  Confidentiality.  The Loan Parties acknowledge that this Agreement and the other Loan Documents are for the Loan Parties' confidential use only and may not, without the written consent of the Lender, be disclosed by any Loan Party to any other Person other than Representatives of the Loan Parties having a need to know the same, except where such disclosure is required by Law or legal process (in which case the Loan Parties agree to notify the Lender promptly thereof).  As used above, "Representatives" of a Loan Party means such Loan Party or its employees, directors, officers attorneys and agents (but not commercial lenders).

[SIGNATURE PAGES TO FOLLOW]

-47-

Borrower Initials: _____

Lender Reference:  Loan Number 105

This Loan Agreement is entered into among us for the uses and purposes hereinabove set forth as of the date first above written.

*"BORROWER"*

McClenny Moseley & Associates, PLLC

By _____
    Name:   James Marshall McClenny
    Title:    Manager

By _____
    Name:   John Zachary Moseley
    Title:    Manager

McClenny Law Group, Inc.

By _____
    Name:   James Marshall McClenny
    Title:    Director

Moseley Law Group, Inc.

By _____
    Name:   John Zachary Moseley
    Title:    Director

*"GUARANTORS / EQUITY PARTNERS"*

[Signature Page to Loan Agreement]

EACH GUARANTOR/EQUITY PARTNER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS LOAN AGREEMENT (WHICH INCLUDES THE GUARANTEE) AS OF THE TIME OF EXECUTION.

By _____
James Marshall McClenny, Individually

By _____
John Zachary Moseley, Individually

"LENDER"

EQUAL ACCESS JUSTICE FUND LP

By:   BEB Partners LLC
Its:   General Partner

By: _____
      Name:   Benjamin E. Blank
      Title:   Manager

[Signature Page to Loan Agreement]

## EXHIBIT A

## NOTICE OF BORROWING

Date: _____, ____

To:   EQUAL ACCESS JUSTICE FUND LP

Ladies and Gentlemen:

Reference is made to that certain loan agreement (as extended, renewed, amended or restated from time to time, the *"Loan Agreement"*) dated as of March 10, 2022, among McClenny Moseley & Associates, PLLC, a Texas professional limited liability company, McClenny Law Group, Inc., a Texas professional corporation, and Moseley Law Group, Inc., a Texas professional corporation (the *"Borrower"*), the Guarantors party thereto, and Equal Access Justice Fund LP (the *"Lender"*).  Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement.  The Borrower hereby gives you notice irrevocably, pursuant to Section 2.1 of the Loan Agreement, of the borrowing specified below:

1.   The Business Day of the proposed borrowing is _____, ____.

2.   The aggregate amount of the proposed borrowing is $_____.

The Borrower hereby certifies that the following statements are true on the date hereof, and will be true on the date of the proposed borrowing, before and after giving effect thereto and to the application of the proceeds therefrom:

(a)   the representations and warranties contained in Section 5 of the Amended and Restated Loan Agreement are true and correct as though made on and as of such date (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct as of such earlier date); and   (b)   no   Default   has occurred and is continuing or would result from such proposed Borrowing.

Lender Reference:  Loan Number 105

## EXHIBIT B

## AMENDED AND RESTATED NOTE

U.S. $10,000,000.00                                                        March 10, 2022

FOR VALUE RECEIVED, the undersigned, McClenny Moseley & Associates, PLLC, a Texas professional limited liability company, McClenny Law Group, Inc., a Texas professional corporation, and Moseley Law Group, Inc., a Texas professional corporation (the *"Borrower"*), hereby promises to pay to Equal Access Justice Fund LP (the *"Lender"*) or its registered assigns at the principal office of the Lender in Wilmington, Delaware (or such other location as the Lender may designate to the Borrower), in immediately available funds, the principal sum of Ten Million and No/100 Dollars ($10,000,000.00), together with any accrued interest added to the principal balance in accordance with Section 2.2 of the Loan Agreement, or, if less, the aggregate unpaid principal amount of the Loans made or maintained by the Lender to the Borrower pursuant to the Loan Agreement, in the manner and subject to the terms of Section 2 of the Loan Agreement, together with interest on the principal amount of such Loans from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Loan Agreement.

This Amended and Restated Note is the Note referred to in the Loan Agreement (as extended, renewed, amended or restated from time to time, the *"Loan Agreement"*) dated as of March 10, 2022, among the Borrower, the Guarantors party thereto, and the Lender, and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Loan Agreement reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Loan Agreement. This Note shall be governed by and construed in accordance with the internal Laws of the State of Delaware.

Reference is hereby made to Section 11.14 of the Loan Agreement. This Note must be construed, and its performance enforced, under the laws of the State of Delaware. Pursuant to Section 11.15 of the Loan Agreement, the parties have agreed to submit all disputes, if any, to final and binding arbitration before Judicial Arbitration and Mediation Services, Inc. ("JAMS") in Wilmington, Delaware. If legal action is necessary outside of arbitration, then BORROWER AND THE LOAN PARTIES HEREBY CONSENT AND AGREE THAT ANY FEDERAL OR STATE COURT LOCATED IN DELAWARE SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS AND DISPUTES BETWEEN BORROWER, ANY GUARANTOR AND LENDER PERTAINING TO THIS NOTE, THE LOAN DOCUMENTS, ANY ARBITRAL PROCEEDING, OR ANY MATTER ARISING OUT OF OR RELATED TO THIS NOTE. Further, Borrower and the Loan Parties hereby irrevocably and unconditionally agree that any suit, action or proceeding arising out of or relating to this Note, any Loan Document, any arbitral proceeding, or any matter arising out of or related to this Note shall be brought in the United States District Court for the District of Delaware or any Delaware State court in New Castle County sitting in Wilmington, Delaware, and any appellate court from any thereof, and Borrower hereby waives any right to object to jurisdiction within either of the foregoing forums by the Lender. Nothing contained herein shall prevent the Lender from bringing any suit, action,

Lender Reference:  Loan Number 105

counterclaim or proceeding or exercising any rights against any security and against any Loan Party and against any property of any Loan Party, within any other jurisdiction, and the initiation of such suit, action or proceeding or taking of such action in any other such jurisdiction shall in no event constitute a waiver of the agreements contained herein with respect to the laws of the State of Delaware governing the rights and obligations of the parties hereto. This paragraph is in addition to and not in lieu of Sections 11.14 and 11.15 of the Loan Agreement, and Sections 11.14 and 11.15 of the Loan Agreement shall apply to this Note.

Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, all in the events, on the terms and in the manner as provided for in the Loan Agreement. Further, this Note may be declared due prior to the expressed maturity hereof in the Event of Default as that term is defined in the Loan Agreement.

This Note is issued in substitution and replacement for, and evidence of all of the indebtedness previously evidenced by, that certain Note dated as of September 30, 2021, made by the undersigned in favor of Lender in the face principal amount of $8,000,000.

The Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

McClenny Moseley & Associates, PLLC

*[Exhibit – Please Do Not Execute]*

By _____

    Name:   James Marshall McClenny
    Title:    Manager

*[Exhibit – Please Do Not Execute]*

By _____

    Name:   John Zachary Moseley
    Title:    Manager

McClenny Law Group, Inc.

*[Exhibit – Please Do Not Execute]*

By _____

    Name:   James Marshall McClenny
    Title:    Director

Moseley Law Group, Inc.

*[Exhibit – Please Do Not Execute]*

By _____

    Name:   John Zachary Moseley
    Title:    Director

## EXHIBIT C

## ADDITIONAL GUARANTOR SUPPLEMENT

Date:  March 10, 2022

To:     EQUAL ACCESS JUSTICE FUND LP

Ladies and Gentlemen:

Reference is made to that certain loan agreement (as extended, renewed, amended or restated from time to time, the *"Loan Agreement"*) dated as of March 10, 2022, among McClenny Moseley & Associates, PLLC, a Texas professional limited liability company, McClenny Law Group, Inc., a Texas professional corporation, and Moseley Law Group, Inc., a Texas professional corporation (the *"Borrower"*), the Guarantors party thereto, and Equal Access Justice Fund LP (the *"Lender"*).  Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement.  The undersigned, [name of new Guarantor], an Equity Partner in the Borrower, hereby elects to be a *"Guarantor"* for all purposes of the Loan Agreement, effective from the date hereof.  The undersigned confirms that the representations and warranties set forth in Section 5 of the Loan Agreement are true and correct as to the undersigned as of the date hereof (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct as of such earlier date) and the undersigned shall comply with each of the covenants set forth in Section 7 of the Loan Agreement applicable to it.

Without limiting the generality of the foregoing, the undersigned hereby agrees to perform all the obligations of a Guarantor under, and to be bound in all respects by the terms of, the Loan Agreement, including without limitation Section 9 thereof, to the same extent and with the same force and effect as if the undersigned were a signatory party thereto.

The undersigned acknowledges that this Agreement shall be effective upon its execution and delivery by the undersigned to the Lender, and it shall not be necessary for the Lender to execute this Agreement or any other acceptance hereof.  This Agreement shall be construed in accordance with and governed by the internal Laws of the State of Delaware.

Very truly yours

*[Exhibit– Please Do Not Execute]*

[INSERT NAME OF NEW GUARANTOR], individually

Lender Reference:  Loan Number 105

## EXHIBIT D
## DIRECTION OF PROCEEDS

Date: March 10, 2022

To:     EQUAL ACCESS JUSTICE FUND LP

Reference is made to that certain loan agreement (as extended, renewed, amended or restated from time to time, the *"Loan Agreement"*) dated as of March 10, 2022, among McClenny Moseley & Associates, PLLC, a Texas professional limited liability company, McClenny Law Group, Inc., a Texas professional corporation, and Moseley Law Group, Inc., a Texas professional corporation (the *"Borrower"*), the Guarantors party thereto, and Equal Access Justice Fund LP (the *"Lender"*). Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement. The Borrower hereby agrees that the proceeds of the Note shall be paid by the Lender as follows:

1.  To the account of, the amount of [_____] Dollars ($[_____]) paid as follows:

    Account Name:
    Account Number:
    Name of Bank:
    Bank Routing Number:
    Reference Information: Equal Access Justice Fund Loan Proceeds

The Borrower acknowledges and agrees that the proceeds from payment number 1 above are net of the payment of the applicable fees set forth in Section 3.1 of the Loan Agreement. The distribution of the Loan proceeds is set forth on Exhibit 1 hereto.

This Direction of Proceeds is hereby executed as of the date first set forth above.

Lender Reference:  Loan Number 105

McClenny Moseley & Associates, PLLC

*[Exhibit – Please Do Not Execute]*

By _____

    Name:   James Marshall McClenny
    Title:    Manager

*[Exhibit – Please Do Not Execute]*

By _____

    Name:   John Zachary Moseley
    Title:   Manager

McClenny Law Group, Inc.

*[Exhibit – Please Do Not Execute]*

By _____

    Name:   James Marshall McClenny
    Title:   Director

Moseley Law Group, Inc.

*[Exhibit – Please Do Not Execute]*

By _____

    Name:   John Zachary Moseley
    Title:   Director

Lender Reference:  Loan Number 105

**EXHIBIT 1**
Loan Proceeds Distribution

| | |
|---|---|
| Gross Loan Proceeds: | $[_____] |
| Fees | $[_____] |

Net Loan Proceeds                                      $[_____]
(to Borrower account per letter to which this exhibit is attached)

Lender Reference:  Loan Number 105

## EXHIBIT E
## COMPLIANCE CERTIFICATE

Date: _____, _____

To:    EQUAL ACCESS JUSTICE FUND LP

Reference is made to that certain loan agreement (as extended, renewed, amended or restated from time to time, the *"Loan Agreement"*) dated as of March 10, 2022, among McClenny Moseley & Associates, PLLC, a Texas professional limited liability company, McClenny Law Group, Inc., a Texas professional corporation, and Moseley Law Group, Inc., a Texas professional corporation (the *"Borrower"*), the Guarantors party thereto, and Equal Access Justice Fund LP (the *"Lender"*). Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement.  This Compliance Certificate is furnished to the Lender pursuant to the Loan Agreement.

THE UNDERSIGNED HEREBY CERTIFIES ON BEHALF OF BORROWER THAT:

1.    I am a Responsible Officer of the Borrower.

2.    I have no knowledge of, the existence of any condition or the occurrence of any event which constitutes a Default or Event of Default during or at the end of the accounting period covered by this Compliance Certificate, except as set forth below.

3.    The representations and warranties contained in Section 5 of the Loan Agreement are true and correct as though made on and as of such date (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct as of such earlier date).

4.    Described below are the exceptions, if any, to paragraph 2 above by listing, in detail, the nature of the condition or event, the period during which it has existed and the action which Borrower has taken, is taking, or proposes to take with respect to each such condition or event:

_____
_____
_____
_____

5.    Described below is an update on each of the following items for such period covered by this Compliance Certificate:

Pro Bono:
Community Service:
Charity:

6.      No Equity Partner has terminated its ownership in the Borrower for any reason.  No Equity Partner who previously had an ownership interest in the Borrower has given notice that such Equity Partner intends to transfer or has transferred a Case to a firm that is not the Borrower, nor to the knowledge of the Borrower, is any such transfer of a Case threatened.

7.      Attached hereto as Schedule I is a true, correct and complete list of all Cases pending as of the date hereof or closed during the accounting period covered by this Compliance Certificate, including, for each Case, style of the cases, names of the parties, cause numbers, locations and the courts in which pending, and notification of which Cases contain Commercial Tort Claims.

8.      Borrower acknowledges that this Certification is made to obtain money, or an extension, renewal, or refinancing of credit, that Lender is relying upon all of the information contained in and attached to this Certification, that Lender's reliance is reasonable, and that falsity, fraud, or misapplication of proceeds by Borrower will render Borrower's Obligations to Lender non-dischargeable in bankruptcy under 11 U.S.C. § 523(a)(2) and (4).

The foregoing certifications are made and delivered as of the date first above written.

Lender Reference:  Loan Number 105

McClenny Moseley & Associates, PLLC

*[Exhibit— Please Do Not Execute]*

By _____

Name: James Marshall McClenny
Title: Manager


*[Exhibit— Please Do Not Execute]*

By _____

Name: John Zachary Moseley
Title: Manager


McClenny Law Group, Inc.

*[Exhibit— Please Do Not Execute]*

By _____

Name: James Marshall McClenny
Title: Director


Moseley Law Group, Inc.

*[Exhibit – Please Do Not Execute]*

By _____

Name: John Zachary Moseley
Title: Director


Lender Reference: Loan Number 105

**SCHEDULE I**
**TO COMPLIANCE CERTIFICATE**

McClenny Moseley & Associates, PLLC;

McClenny Law Group, Inc.;

Moseley Law Group, Inc.

**CASES**

| | CLIENT NAME(S) | TYPE OF CASE | CURRENT CASE STATUS | AMOUNT RECEIVED TO DATE | LOW ESTIMATE OF FUTURE FEE* AMOUNTS | HIGH ESTIMATE OF FUTURE FEE* AMOUNTS | ESTIMATED TIMEFRAME TO RECEIPT OF PAYMENTS | WHETHER INCLUED COMERCIAL TORT CLAIM |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | |
| 2 | | | | | | | | |
| 3 | | | | | | | | |
| 4 | | | | | | | | |
| ... | | | | | | | | |

*Net fees to the firm after any co-counsel arrangements.

**EXHIBITF**
**Letter of Authorization – on Borrower Letterhead**

[March 10, 2022]

[Bank & Address]

Attention:

Re:          Letter of Authorization for McClenny Moseley & Associates, PLLC, McClenny Law Group, Inc., and Moseley Law Group, Inc. Loan Agreement with Equal Access Justice Fund LP

Dear[_____],

We are writing in regard to the that certain loan agreement (as extended, renewed, amended or restated from time to time, the *"Loan Agreement"*) dated as of March 10, 2022 among McClenny Moseley & Associates, PLLC, a Texas professional limited liability company, McClenny Law Group, Inc.. a Texas professional corporation. and Moseley Law Group. Inc.. a Texas professional corporation(the *"Borrower"*). the Guarantors party thereto. and Equal Access Justice Fund LP (the *"Lender"*). Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement. As part of its obligations under the Loan Agreement. the Borrower is required to permit the Lender to have electronic viewing access into the Borrower's IOLTA Account number _____ (the *"IOLTA Account"*) maintained with _____ Bank (*"you"*).

This letter shall serve as an irrevocable instruction to you from the Borrower to establish and allow such access to information in the IOLTA Account.

You agree to continue to allow such access to the IOLTA Account until receipt of notice from Lender to discontinue such access. The Borrower acknowledges that the Lender is relying on this Letter of Authorization in extending credit to the Borrower under the Loan Agreement. Further, the Borrower and each Guarantor under the Loan Agreement agree not to sue and to hold you harmless from and against any claims and causes of action from complying with the terms of this Letter of Authorization, including allowing access to information in the IOLTA Account.

Lender Reference: Loan Number 105

This Letter of Authorization is executed by the Borrower and each Guarantor as of the date first set forth above.

Sincerely,

McClenny Moseley & Associates, PLLC

*[Exhibit – Please Do Not Execute]*

By _____
    Name:   James Marshall McClenny
    Title:    Manager

*[Exhibit – Please Do Not Execute]*

By _____
    Name:   John Zachary Moseley
    Title:    Manager

McClenny Law Group, Inc.

*[Exhibit – Please Do Not Execute]*

By _____
    Name:   James Marshall McClenny
    Title:    Director

Moseley Law Group, Inc.

*[Exhibit – Please Do Not Execute]*

By _____
    Name:   John Zachary Moseley
    Title:    Director

*[Exhibit – Please Do Not Execute]*
_____
John Zachary Moseley, individually

Lender Reference:  Loan Number 105

*[Exhibit – Please Do Not Execute]*
_____

James Marshall McClenny, individually

cc:     Benjamin E. Blank, Manager of Equal Access Justice Fund LP

Lender Reference:  Loan Number 105

### EXHIBIT G
#### MONTHLY COMPLIANCE CERTIFICATE

Date: _____, ____

To:   EQUAL ACCESS JUSTICE FUND LP

Reference is made to that certain loan agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the *"Loan Agreement"*) dated as of March 10, 2022, among McClenny Moseley & Associates, PLLC, a Texas professional limited liability company, McClenny Law Group, Inc., a Texas professional corporation, and Moseley Law Group, Inc., a Texas professional corporation (the *"Borrower"*), the Guarantors party thereto, and Equal Access Justice Fund LP, a Delaware limited partnership (the *"Lender"*). Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement. This Compliance Certificate is furnished to the Lender pursuant to the Loan Agreement.

THE UNDERSIGNED HEREBY CERTIFIES ON BEHALF OF BORROWER THAT:

1.      I am a Responsible Officer of the Borrower.

2.      I have reviewed the terms of the Loan Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of Borrower during the "Compliance Period," which is the period from (a) the later of (i) the initial funding of the loan and (ii) the end of the period covered by the most recent Compliance Certificate, through (b) the date hereof.

3.      The examinations described in paragraph 2 above did not disclose, and I have no knowledge of, the existence of any noncompliance with the reporting required in Section 7.3(b) of the Loan agreement, or with the Mandatory Payments (all revenue has been reported to Lender and I have made, or will be making, payment as required by Section 2.4 of the Loan Agreement), except as set forth below in paragraph 8.

4.      The examinations described in paragraph 2 above did not disclose, and I have no knowledge of, the existence of any condition or the occurrence of any event which constitutes a Default or Event of Default during or at the end of the Compliance Period as of the date of this Compliance Certificate, except as set forth below in paragraph 8.

5.      The financial information required by Section 7.3 of the Loan Agreement submitted for this Compliance Period present fairly in all material respects the financial condition of the Borrower.

6.      The representations and warranties contained in Section 5 of the Loan Agreement are true and correct as though made on and as of such date (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct as of such earlier date).

Lender Reference:  Loan Number 105

7.      Described below are the exceptions, if any, to paragraphs 3 and 4 above by listing, in detail, the nature of the condition or event, the period during which it has existed and the action which Borrower has taken, is taking, or proposes to take with respect to each such condition or event:

_____

_____

_____

_____

_____

8.      No Equity Partner has terminated its ownership in the Borrower for any reason. No Equity Partner who previously had an ownership interest in the Borrower has given notice that such Equity Partner intends to transfer or has transferred a Case to a firm that is not the Borrower nor, to the knowledge of the Borrower, is any such transfer of a Case threatened.

The foregoing certifications are made and delivered as of the date first above written.

Lender Reference:  Loan Number 105

McClenny Moseley & Associates, PLLC

*[Exhibit – Please Do Not Execute]*

By _____

    Name:   James Marshall McClenny
    Title:    Manager

*[Exhibit– Please Do Not Execute]*

By _____

    Name:   John Zachary Moseley
    Title:    Manager

McClenny Law Group, Inc.

*[Exhibit – Please Do Not Execute]*

By _____

    Name:   James Marshall McClenny
    Title:    Director

Moseley Law Group. Inc.

*[Exhibit – Please Do Not Execute]*

By _____

    Name:   John Zachary Moseley
    Title:    Director

Lender Reference:  Loan Number 105

## Exhibit H
### Closing Collateral Certification

Date: _____, _____

To:     Equal Access Justice Fund LP

Reference is made to that certain loan agreement (as extended, renewed, amended or restated from time to time, the *"Loan Agreement"*) dated as of March 10, 2022, among McClenny Moseley & Associates, PLLC, a Texas professional limited liability company, McClenny Law Group, Inc., a Texas professional corporation, and Moseley Law Group, Inc., a Texas professional corporation (the *"Borrower"*), the Guarantors party thereto, and Equal Access Justice Fund LP (the *"Lender"*). Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement. This Closing Collateral Certification is furnished to the Lender pursuant to the Loan Agreement.

The Undersigned hereby certifies on behalf of Borrower that:

1.      I am a Responsible Officer of the Borrower.

2.      I have reviewed the terms of the Loan Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of Borrower during the "Underwriting Period," which is the period from (a) the date Borrower last provided information on its docket of Cases, through (b) the Closing Date.

3.      The examinations described in paragraph 2 above did not disclose, and I have no knowledge of, the existence of any material adverse changes to the financial condition of the Borrower or the Borrower's docket of Cases during the Underwriting Period, except as set forth below in paragraph 4.

4.      Described below are the exceptions, if any, to paragraphs 3 above by listing, in detail, the nature of the condition or event, the period during which it has existed and the action which Borrower has taken, is taking, or proposes to take with respect to each such condition or event:

_____

_____

_____

_____

_____

5.      No Equity Partner has terminated its ownership in the Borrower for any reason. No Equity Partner who previously had an ownership interest in the Borrower has given notice that such Equity Partner intends to transfer or has transferred a Case to a firm that is not the Borrower nor, to the knowledge of the Borrower, is any such transfer of a Case threatened.

Lender Reference:  Loan Number 105

6.     The following (or listing attached hereto) is a correct and complete list of all active cases of borrower as of the Closing Date:

| | CLIENT NAME(S) | TYPE OF CASE | CURRENT CASE STATUS | AMOUNT RECEIVED TO DATE | LOW ESTIMATE OF FUTURE FEE* AMOUNTS | HIGH ESTIMATE OF FUTURE FEE* AMOUNTS | ESTIMATED TIMEFRAME TO RECEIPT OF PAYMENTS |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| ... | | | | | | | |

*Net fees to the firm after any co-counsel arrangements.

    The foregoing certifications are made and delivered as of the date first above written.

Lender Reference:  Loan Number 105

McClenny Moseley & Associates, PLLC

*[Exhibit– Please Do Not Execute]*

By _____

    Name:    James Marshall McClenny
    Title:     Manager


*[Exhibit–Please Do Not Execute]*

By _____

    Name:    John Zachary Moseley
    Title:     Manager


McClenny Law Group, Inc.

*[Exhibit– Please Do Not Execute]*

By_____

    Name:    James Marshall McClenny
    Title:     Director


Moseley Law Group, Inc.

*[Exhibit – Please Do Not Execute]*

By _____

    Name:    John Zachary Moseley
    Title:     Director

**SCHEDULE 10.2**

**DEPOSIT ACCOUNTS**

| DEPOSITORY | ACCOUNT NAME | ACCOUNT NUMBER | ACCOUNT TYPE |
|---|---|---|---|
| Oakwood Bank | McClenny, Moseley & Associates, PLLC- Operating | ███████ | Operating |
| Oakwood Bank | McClenny, Moseley & Associates, PLLC- IOLTA | ███████ | IOLTA |

Lender Reference:  Loan Number 105